**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 29 2012, 9:44 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARY SPEARS**
Gilroy Kammen Maryan & Moudy
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**NICOLE M. SCHUSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| RYAN SHECKLES, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 10A04-1108-CR-423 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE CLARK CIRCUIT COURT
The Honorable Daniel E. Moore, Judge
Cause No. 10C01-1007-MR-600

**May 29, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant Ryan Sheckles appeals his convictions and sentence on two counts of Murder,[1] a felony. Sheckles makes numerous arguments challenging his convictions, including that the evidence was insufficient and that the trial court erred in its response to the jury's question regarding accomplice liability.

Sheckles also challenges his convictions based on prosecutorial misconduct. More particularly, Sheckles asserts that the prosecutor portrayed the jury as an arm of law enforcement, urging that its duty was to convict. Furthermore, Sheckles contends that the prosecutor denigrated defense counsel, inappropriately invoked sympathy for the victims, and requested that the jury convict based on facts not in evidence.

Moreover, Sheckles claims that his convictions must be set aside because fundamental error resulted from the admission of opinion testimony that Sheckles was the shooter from a non-eyewitness. Sheckles also maintains that fundamental error occurred when the jury was permitted to make an inference about his negative character based upon the disruptive behavior of his cousin, Robert, when the trial court failed to instruct the jury to disregard it. Sheckles's final attack on his convictions is that they must be set aside because the trial court refused to permit the defense to cross-examine a State's witness on her arrest for giving false information, contending that this was an improper restriction of his right to confrontation under the United States and Indiana Constitutions.

Sheckles also challenges the 120-year sentence that was imposed following his convictions. Essentially, Sheckles argues that the trial court abused its discretion by

[1] Ind. Code § 35-42-1-1.

2

failing to consider his below-average intelligence as evidenced by his IQ score as a mitigating circumstance. Finding no error, we affirm the decision of the trial court.

## FACTS[2]

On August 25, 2009, Robert Sheckles, Sheckles's cousin, called his girlfriend, Laisha Smith, and asked if she could drive him and Sheckles so that Sheckles could sell drugs. Smith had done this many times before and would drive the pair to different places, and Sheckles and Robert would deal cocaine to various clients. Sheckles and Robert would reimburse Smith by paying for fuel and giving her $40 to spend on painkillers, which she had been addicted to after having three surgeries her junior year in high school.

At about 8:00 p.m. on August 25, Smith picked up Sheckles and Robert at the Evergreen Apartments in Clarksville in her father's dark green Ford pickup truck. Sheckles sat beside Smith in the front passenger seat, while Robert sat in the middle of the backseat. They stopped at Robert Fanning's home, where Sheckles either sold him cocaine or marijuana. Eventually, Sheckles directed Smith to drive to another place in Jeffersonville, where she had never been before. As they drove, Sheckles received several calls from Larry Morrow, who was using his ex-wife's, Shannon Morrow's, cell phone.

---

[2] We heard oral argument on April 10, 2012, in the courtroom of the Indiana Supreme Court. We would like to thank counsel for their presentations and the Indiana University Robert H. McKinney School of Law students who attended the argument for their presence and respectful demeanor. Additionally, we want to express our appreciation to the administration, technology support, and staff of the Indiana Supreme Court for their assistance.

Following Sheckles's instructions, Smith stopped the vehicle, and as soon as she put the vehicle in park, Larry ran to the side of the truck where Sheckles was sitting in the front passenger seat. Larry asked why it took so long for them to arrive. Smith pulled out her cell phone to check her text messages. Sheckles and Larry began arguing about how much money Larry had and how much cocaine Sheckles would give him. Shannon approached as the two of them argued. At some point Larry placed money in Sheckles's lap. The argument escalated and Sheckles pulled a gun from his waistband and shot Larry in the face, killing him. Sheckles then shot Shannon as she turned and fled.

Shannon had a broken foot and could not move easily. Yet, despite Shannon's injury and the fact that Sheckles shot her three times from the rear as she fled, she managed to get back inside the house. Shannon called her father, Connison Howard, to tell him that she had been shot. Howard drove the four blocks from his home to where Shannon was located. There, Howard discovered Larry lying dead on the street in front of the house and Shannon bleeding in the kitchen. Howard called 911 and stayed with Shannon until help arrived. Shannon was transported to the hospital where she died of her injuries in early September 2009.

Sheckles and Robert told Smith to drive, and she put the truck in gear and drove. Smith ran over Larry as she pulled away. When Smith stopped at an intersection, Sheckles put his gun out the window and shot up into the air, yelling a gang slogan. Sheckles remarked that if he had not killed Shannon right there, he would have to find a way into the hospital to kill her so that she could not be a witness to what had happened.

4

Sheckles told Smith to keep driving, but before they went far, Robert told Smith to pull over and let him out, which she did. Robert fled between two houses, and Sheckles told Smith to drive to Louisville and reminded her to turn on her lights, which she had forgotten to do.

As Smith pulled away, two of Larry's neighbors, Tausha Johnson and Eugenia Tharp, saw a dark vehicle with its lights off come down the street and turn. The women initially thought the gun shots were firecrackers, but as emergency vehicles began to arrive, they went to investigate.

Smith drove Sheckles to a McDonald's restaurant in Louisville where he stepped out of the truck and began looking for casings. Sheckles received a phone call from Robert, and Sheckles told Smith to drive back to Jeffersonville to pick up Robert. After picking up Robert, Smith drove back to Louisville to pick up Sheckles. Sheckles stated that he had disposed of the gun in a dumpster and had Smith drive them to a Motel 6 in Lousiville.

When they arrived at the motel, two of Sheckles's and Robert's friends were there trying to obtain a room. After they checked in, the five of them went up to the room. Smith was in the back bedroom area of the suite talking to Robert about what had happened. Sheckles joined them and told Smith not to say anything about what happened because, "we don't want anything like this to happen to you." Tr. p. 804. Smith promised not to say anything. Smith left to go home as her father needed his truck for work.

5

The next day, Smith drove Sheckles and Robert to Fanning's home and dropped off some gun clips. Robert gave Fanning the gun clips to hide in exchange for some marijuana. Sheckles and Robert also wanted Smith to go to Tennessee to change the tires on her father's truck. Sheckles thought that Smith might have run over Larry's foot, leaving evidence on the tires. Smith picked up Sheckles and Robert and an older friend of the pair, a man referred to as "Sixty-Eight." Tr. p. 808. Sixty-Eight drove the four to Tennessee and took them to a bar where his family was already located, and they all went into the bar. Sixty-Eight and Sheckles began drinking, but Smith and Robert went back to the truck to talk. Smith eventually drove the men home without changing the tires on the truck.

The next day, August 27, Fanning's wife discovered the gun clips that Fanning had hidden in the refrigerator. After Fanning's wife was told to remove the gun clips from their home, she called Sheckles and Robert to come pick them up. Upon arrival, Sheckles refused to take the gun clips, but Robert took them from Fanning.

On August 30, 2009, Smith was incarcerated for an unrelated offense for approximately three and one-half months. Smith spoke to Robert on the telephone from jail multiple times, but she let her relationship with Robert lapse after she was released. However, Smith had a conversation with Sheckles following her release during which he asked how she was doing and for her telephone number. Later, Smith encountered Sheckles in jail when she visited a friend, and Sheckles told her that law enforcement had questioned him about the Morrow murders and that he knew how to talk to law

6

enforcement officers so that they would not think one of them was involved. Sheckles advised Smith that, if questioned by law enforcement, she should say nothing and act like she did not know what the officers were talking about.

Several police officers questioned Sheckles after tracing Larry's last phone calls made on Shannon's phone to Megan Tomlinson who led them to Sheckles. Eventually, an anonymous tip led law enforcement officers to Smith in July 2010. Detective Brian Mitchell was able to identify the Motel 6 that Smith was at with Sheckles and Robert and the two friends. Detective Mitchell identified the renter of the motel room as T. Harris, who Smith identified as one of Sheckles's friends who she knew as "Magic" and the one who rented the room. Tr. p. 896-900. Detective Mitchell was also able to identify "Sixty-Eight" as Dwayne Moore, and Moore confirmed the Tennessee trip. Id. at 901-02.

Smith's statement led police officers to investigate Sheckles and Robert as suspects. Investigators discovered a corner of a plastic baggie at the crime scene that led them to suspect that drugs were involved in the killings because such corners are used to package illegal drugs. Eventually, after obtaining DNA samples from the victims and suspects, investigators were able to identify Sheckles's DNA as the major contributor in a mixed DNA profile discovered on a Newport cigarette – Sheckles's favored brand – found at the scene. Larry, Smith, and Robert were excluded as contributors to the mixed DNA profile on the cigarette. On a second cigarette found at the scene that bore a mixed DNA profile, Larry was the major DNA contributor, but Sheckles could not be excluded as a contributor, but Smith and Robert were excluded.

7

On July 30, 2010, the State charged Sheckles with two counts of murder. Sheckles's jury trial commenced at May 31, 2011. Smith and Robert were part of the State's case-in-chief, insofar as they were to testify against Sheckles pursuant to plea agreements with the State. Smith's agreement was for immunity in exchange for her testimony. Smith testified regarding the terms of her agreement. She also admitted that she had a prior conviction for shoplifting or conversion[3] and that she had a pending case in Clark County for class D felony possession of a controlled substance and a misdemeanor battery charge.

The defense wanted to inquire about Smith's prior arrest for resisting law enforcement, assisting a criminal, and providing false information, arguing that because the false informing charge was only dismissed pursuant to a plea agreement, it was still available for impeachment purposes. The trial court did not permit the inquiry, determining that the Rules of Evidence did not permit inquiry into charged crimes not reduced to conviction or other bad acts generally, and did not wish to "speculate behind the plea agreement" as to why the false informing charge had been dismissed. Tr. p. 762-64.

Robert testified regarding his plea agreement that would allow him to plead guilty to class D felony assisting a criminal. However, Robert decided not to testify and emphasized his decision to the trial court using vulgar language. Robert did not testify and out of the jury's presence, Robert's proposed plea was withdrawn and he was

---

[3] The record is unclear whether Smith's prior conviction was for conversion or shoplifting.

dismissed. The trial court explained to the jury, "The prior witness Robert Sheckles has been discharged and won't be available for any further questioning by either side." Tr. p. 765.

The State also presented testimony from Robert Fanning who stated that on August 26th, he received a call from Sheckles asking him to hold something in exchange for marijuana. Smith, Sheckles, and Robert arrived at Fanning's house in Smith's father's truck with Sheckles in the backseat. Robert handed Fanning some gun clips.

Howard, Shannon's father, also testified for the State. When asked how he felt about the other two people involved in murder receiving immunity in exchange for their testimony, he responded, "I really don't give a d*mn." Tr. p. 546. When the defense objected on relevance grounds, the State conceded the answer was probably irrelevant but that eliciting such testimony was "the right thing to do." Id. at 547. The trial court permitted Howard to continue: "The only thing I'm worried about is the man that shot my daughter and shot [Larry]. He's the one that I want." Id. at 548.

During closing argument, the prosecutor referred to Robert, calling him and Sheckles "as tight as they can be, connected at the hip." Tr. p. 943. Nevertheless, the prosecutor pointed out that Robert had not told the jury that Sheckles was not guilty despite have "every opportunity" to exculpate Sheckles, noting that "what he didn't say is just as important, or more important as what he did say." Id. at 943-44.

Later, in his rebuttal, the prosecutor informed the jury that defense attorneys will do "three things[:] Confuse, conceal, and create." Id. at 990. Elaborating, the prosecutor

9

told the jury "[i]f both the law and the facts are against you, you throw up smoke and mirrors. You just saw an academy award appearance of [Sheckles's attorney] showing you smoke and mirrors and you are smarter than that." Id. at 1001-02. The prosecutor also opined that "[i]t's going to take courage from you to convict this man. Not because we didn't prove the case. This is a scary situation." Id. at 999-1000. Finally, the prosecutor asked the jury to put their loved ones in the place of Shannon and to imagine that it was one of their loved ones dying a death such as hers.

The jury received the case on the afternoon of June 6, 2011. Around lunchtime on the second day of deliberations, the jury sent out a note with a question. In the presence of the attorneys, the trial court read the note aloud, which stated, "[D]oes Ryan Sheckles need or have to have the gun in his hand to be guilty as stated in the charges, or according to Indiana state law is a person guilty if he participates? We are not lawyers and don't know how to interpret certain instructions." Tr. p. 1019-20.

The State and the defense argued back and forth as to how to answer the jury's question. Ultimately, without objection from either party, the trial court returned to the jury a note, which read, "A person may be found guilty of murder if he [knowingly or intentionally] commits, aids, induces or causes the murder." Id. at 1037.

On June 7, 2011, one hour after the trial court sent the jury the above note, the jury found Sheckles guilty of two counts of murder – one count for Larry and one count for Shannon. On July 21, 2011, the trial court held a sentencing hearing where Sheckles argued that his IQ of only 56 should be a mitigating factor. The trial court rejected this

10

and found no mitigating factors. In aggravation, the trial court observed that by the age of twenty-four, Sheckles had a significant history of delinquent and criminal behavior; he had committed a crime of violence, he had been on probation at the time of the murders; Shannon was physically infirm at the time of the crime; Sheckles's behavior after the crime, shooting the gun in the air, the disposal of the weapon, and threatening Smith; and Sheckles committed the murders in the course of committing the crime of dealing in cocaine. The trial court sentenced Sheckles to sixty years imprisonment on each count to run consecutively to each other, for an aggregate term of 120 years. Sheckles now appeals.

## DISCUSSION AND DECISION

### I. Sufficiency of the Evidence

Sheckles argues that there was insufficient evidence to support his murder convictions either as a principle or as an accomplice and invokes the incredible dubiosity rule, contending that Smith's testimony "was inherently improbable and internally contradictory." Appellant's Br. p. 13. The standard of review for sufficiency claims is well settled; this Court will neither reweigh the evidence nor judge the credibility of witnesses. Jackson v. State, 925 N.E.2d 369, 375 (Ind. 2010), reh'g denied. Rather, we will consider only the evidence favorable to the trial court's verdict and all reasonable inferences therefrom. Alvies v. State, 905 N.E.2d 57, 61 (Ind. Ct. App. 2009). We will not reverse for insufficient evidence unless no rational fact finder could have found the

11

defendant guilty beyond a reasonable doubt. Clark v. State, 728 N.E.2d 880, 887 (Ind. Ct. App. 2000).

Notwithstanding these general principles, the doctrine of incredible dubiosity allows a reviewing court to reevaluate the credibility of a witness when "a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence." Fajardo v. State, 859 N.E.2d 1201, 1208 (Ind. 2007). The "[a]pplication of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." Id.

A defendant cannot appeal to this exception by merely showing some inconsistency or irregularity in a witness's testimony. Cowan v. State, 783 N.E.2d 1270, 1278 (Ind. Ct. App. 2003). Rather, a defendant must show that the witness's testimony "runs counter to human experience" such that no reasonable person could believe it. Campbell v. State, 732 N.E.2d 197, 207 (Ind. Ct. App. 2000). Moreover, the rule does not apply when testimony is corroborated by additional witnesses or circumstantial evidence. Thompson v. State, 765 N.E.2d 1273, 1274 (Ind. 2002).

Sheckles directs us to Sisson v. State, 710 N.E.2d 203 (Ind. Ct. App. 1999), in support of his assertion that his convictions should be reversed because Smith's testimony was incredibly dubious. In Sisson, the State's chief witness testified that Sisson was with him and burglarized three homes. 710 N.E.2d at 206. On cross-examination, however, the witness changed his testimony, stating that Sisson was not

12

with him while he burglarized two of the homes.  Id.  The witness also stated that Sisson never entered the home but was only present while the third home was burglarized.  Id.

On appeal, a panel of this Court quickly disposed of the State's argument that the incredible dubiosity rule did not apply because the witness's testimony was not coerced, opining, "it applies to inherently contradictory testimony that is either coerced or equivocal." Id. at 207 (emphases in original).  The panel went on to conclude that the witness's testimony was both contradictory and equivocal and that the circumstantial evidence, consisting of a footprint, was inconclusive.  Id.  Consequently, the panel reversed Sisson's conviction.  Id. at 208.

In this case, although Smith may have been unsure about some of the details surrounding the murders, she was sure that Sheckles shot Larry and in the direction of Shannon.  Tr. p. 795-96.  In addition, there is circumstantial evidence in the instant case that was not present in Sisson, namely, portions of Smith's testimony was corroborated by the police investigation, tr. p. 896-902, and Fanning's testimony regarding Sheckles's desire to get rid of the ammunition.  Id. at 724-30.  Additionally, there was DNA evidence that placed Sheckles at the murder scene.  Id. at 611.  This circumstantial evidence makes Sheckles's reliance on the incredible dubiosity rule misplaced.  See Majors v. State, 748 N.E.2d 365, 367 (Ind. 2001) (opining "[b]ecause circumstantial evidence of Majors' guilt exists, her reliance on the incredible dubiosity rule is misplaced").

Notwithstanding the above, Sheckles, in a related argument, maintains that, apparently, the jury did not believe Smith's testimony in light of a note it sent to the trial court asking "does Ryan Sheckles need or have to have the gun in his hand to be guilty as stated in the charges, or according to Indiana State law is a person guilty if he participates?" Tr. p. 1019-20. The State responds that:

> the basis for the jury's determination of guilt is hidden from examination by the fact that the jury was instructed on two basis [sic] of liability. Absent any evidence as to the jury's reasoning, which evidence is never admissible, this note is indicative merely that the jury fully engaged in the deliberative process.

Appellee's Br. p. 15.

Because Indiana law does not distinguish between a principal and one who aids in the commission of an offense, the jury could have convicted Sheckles on proof that he aided or was the principal. McNeill v. State, 936 N.E.2d 358, 360 (Ind. Ct. App. 2010). Accordingly, to convict Sheckles of murder, the State was required to show that he knowingly or intentionally killed another human being or that he caused Robert to knowingly or intentionally kill another human being. Ind. Code § 35-42-1-1(1).

This Court considers four factors when determining whether the defendant aided another in the commission of a crime: (1) defendant's presence at the scene of the crime; (2) his companionship with another engaged in criminal activity; (3) his failure to oppose the crime; and (4) his conduct before, during, and after the occurrence of the crime. McNeill, 936 N.E.2d at 360.

14

Assuming solely for argument's sake that the jury believed only a portion of Smith's testimony in light of her apparent confusion, at times, between Sheckles and Robert, there was still sufficient evidence to convict Sheckles. Specifically, Sheckles was present at the scene of the crime, Sheckles and Robert were together frequently to engage in drug dealing, the evidence indicates that Sheckles did not oppose the murders, and indeed, there is evidence that he helped to conceal them. Consequently, the evidence was sufficient to convict Sheckles under accomplice liability, and this argument fails.

## II. Jury Instruction

Still focusing on accomplice liability, Sheckles argues that the trial court committed fundamental error by giving the jury an additional instruction regarding accomplice liability and that the instruction had the effect of instructing the jury that it could convict based on conduct that did not constitute proof of guilt. As stated above, after the jury began deliberations, it sent a note to the trial court asking "does Ryan Sheckles need or have to have the gun in his hand to be guilty as stated in the charges, or according to Indiana State law is a person guilty if he participates?" Tr. p. 1019-20.

The trial court interpreted the question as one of law and determined that an additional instruction was necessary, but decided that any instruction that was added would be read to the jury in conjunction with all the instructions. However, after extensive discussion with counsel from both parties, the trial court proposed: "Why don't we just send an answer back that says, according to Indiana State Law a person is guilty or can be found guilty if he participates in the commission of murder." Tr. p. 1035. Both

15

parties agreed after the answer was reformulated to read: "A person may be found guilty of murder if he [knowingly or intentionally] commits, aids, induces or causes the murder." Id. at 1037. The jury was given this additional instruction.

Sheckles directs this Court to Graves v. State, 714 N.E.2d 724, 727 (Ind. Ct. App. 1999), where a panel of this Court held that it was error for a trial court to give an additional instruction to a jury. In Graves, the trial court was faced with a jury question regarding accomplice liability. Id. at 725-26. Under Indiana Code section 34-36-1-6 and applicable case law, the trial court determined that the jury's question was a question of law that required an additional instruction. Id. at 726. Over the defendant's objection and a request that all the jury instructions be reread along with the additional instructions, the trial court only read the additional instruction on accomplice liability. Id.

Conversely, in Downs v. State, 656 N.E.2d 849, 851 (Ind. Ct. App. 1995), where the "[t]he trial court did not reread all of the instructions at the time, by agreement of the parties," this Court held that no error had occurred. Id. at 853. In contrasting the two cases, in Graves, this Court held that the facts there differed from those in Downs in pertinent part, noting that

> the State overlooks the fact that in Downs, the parties agreed that the trial court did not have to re-read all of the instructions. The facts in the present case are obviously very different where the defendant strenuously objected to the court providing any additional instructions to the jury, as well as to providing an additional instruction without re-reading the entire set of final instructions. We find that Downs is distinguishable from the case at bar and therefore not controlling.

Graves, 714 N.E.2d at 726.

16

Here, both parties agreed with the trial court that the jury needed an additional instruction and that neither party objected to the trial court's proposed solution of simply sending back a brief additional instruction. As such, Sheckles has waived any claim of error. See Godby v. State, 736 N.E.2d 252, 257 (Ind. 2000) (holding that since the defendant agreed to how the trial court responded to the jury's questions during deliberations, he cannot claim error on appeal).

Nevertheless, Sheckles claims that the trial court committed fundamental error, inasmuch as it failed to define "participation." More particularly, Sheckles points out that the trial court failed to sufficiently inform the jury that passive conduct did not constitute "participation" and, therefore, could not have resulted in a conviction.

Even assuming solely for argument's sake that the trial court erred by failing to define "participation," the error was harmless. An error is harmless if the error did not affect the substantial rights of the defendant. Gantt v. State, 825 N.E.2d 874, 879 (Ind. Ct. App. 2005). Here, the jury did not understand the accomplice liability instruction, and the trial court responded, addressing only their claimed point of confusion. The trial court's response was specific to their question and did not bring an undue emphasis to the instruction. It is also noteworthy that the jury had access to all the instructions and could read them during deliberations. Tr. p. 1002 (trial court sent four copies of the final instructions into the jury room during deliberations). In other words, the jury was not dependent upon the trial court to reread the instructions. Therefore any error was harmless, and this argument fails.

17

## III. Prosecutorial Misconduct

Sheckles argues that the prosecutor committed misconduct during closing argument by: (1) recruiting the jury as an arm of law enforcement and urging it to perform its job by convicting Sheckles; (2) tainting the jury's view of defense counsel; (3) telling the jury to imagine that their loved ones were the victims of the crime; (4) urging the jury to convict on facts not in evidence.

In reviewing a claim of prosecutorial misconduct, this Court employs a two-step analysis. Reynolds v. State, 797 N.E.2d 864, 868 (Ind. Ct. App. 2003). First, we consider whether the prosecutor engaged in misconduct. Id. If so, then we consider whether, in light of all the circumstances, the misconduct placed the defendant in a position of grave peril to which he should not have been subjected. Surber v. State, 884 N.E.2d 856, 865 (Ind. Ct. App. 2008). "The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." Id.

Because Sheckles failed to object to any of the prosecutor's comments, he has waived his claims on appeal. See Lainhart v. State, 916 N.E.2d 924, 931 (Ind. Ct. App. 2009) (stating that to preserve a claim of prosecutorial misconduct, a defendant must not only contemporaneously object, but also request an admonishment and if the admonishment is insufficient, then he must request a mistrial).

Waiver notwithstanding, Sheckles proceeds on a theory of fundamental error. Fundamental error is an extremely narrow exception that permits a defendant to avoid

18

waiver of an issue; for prosecutorial conduct to amount to fundamental error, it must have been so prejudicial to the rights of the defendant as to make a fair trial impossible. Cowan v. State, 783 N.E.2d 1270, 1277 (Ind. Ct. App. 2003). "A review of the totality of the circumstances and a determination whether the error had a substantial influence upon the outcome are required." Id.

Moreover, Sheckles's arguments are based on statements made during closing argument. During a closing argument, an attorney may argue any reasonable inference or logical conclusion that may be drawn from the admitted evidence. Cooper v. State, 854 N.E.2d 831, 835-37 (Ind. 2006). Additionally, attorneys may argue for any logical or reasonable conclusion consistent with the attorney's theory of the case and may suggest conclusions with regard to the opposing party's theory of the case. Bennett v. State, 423 N.E.2d 588, 592 (Ind. 1981).

Here, during closing argument, the prosecutor stated: "It's going to take courage from you to convict this man. Not because we didn't prove the case. This is a scary situation." Tr. p. 999-1000. The prosecutor urged the jury to have the courage to convict Sheckles, a "dog" of a human being who committed two murders. Id. at 999, 1001. Sheckles contends that these statements had the effect of putting the jury on the prosecutorial team.

Additionally, the prosecutor argued that the defense sought only to "[c]onfuse, conceal, and create," which amounted to an "academy award" performance of "smoke

19

and mirrors." Tr. p. 990; 1001. Sheckles asserts that this improperly denigrated defense counsel.

Discussing in detail what the victim, Shannon Morrow, must have suffered after being shot, the prosecutor stated:

> She made it to the house. She calls, and this one I have to agree with Ms. Culotta, can you imagine something like this or anything happened to your children or your grandchildren, your loved one and you get sent to Louisville and they don't know who you are or where you are, and the clock's ticking, she's packing three rounds of exit wounds. She has been shot through and through. She is bleeding and she will eventually die one of the most horrendous deaths you can imagine and we don't even have or we can't even give an autopsy picture for you.

Tr. p. 998. Sheckles maintains that this improperly invoked sympathy for the victim.

Sheckles's final claim of prosecutorial misconduct focuses on the prosecutor's argument that because Robert did not testify that Sheckles did not commit the murders, he must have knowledge that he did commit them.

While the State acknowledges that some of the prosecutor's comments were inappropriate, namely, the comments denigrating defense counsel, it maintains that they did not amount to fundamental error. We agree with the State on both points. Indeed, although we are quite disappointed in the prosecutor's tenor, the comments did not amount to reversible error, inasmuch as Sheckles was not denied a fair trial. See Cowan, 783 N.E.2d at 1277 (holding that for prosecutorial misconduct to amount to fundamental error, it must have been so prejudicial to the rights of the defendant to make a fair trial impossible). Accordingly, this argument fails.

20

## IV. Admission of Evidence

Sheckles argues that fundamental error resulted from the admission of non-eyewitness opinion testimony that Sheckles was the shooter and the trial court's failure to exert adequate control over Robert Sheckles. The State counters that the trial court properly admitted relevant evidence.

Trial courts are given broad discretion in determining whether to admit or exclude evidence, and we review evidentiary determinations only for an abuse of that discretion. Conrad v. State, 938 N.E.2d 852, 855 (Ind. Ct. App. 2010). An abuse of discretion occurs when a trial court's ruling is clearly against the facts and circumstances before it. Oatts v. State, 899 N.E.2d 714, 719 (Ind. Ct. App. 2009). Furthermore, an evidentiary error may not support reversal of a conviction unless the error affected the defendant's substantial rights. Id.

Insofar as Sheckles concedes that he did not object to the admission of the evidence on the grounds he now claims was error, he argues that its admission was fundamental error. As stated above, fundamental error is a very narrow doctrine and is defined as error so prejudicial that the defendant is denied fundamental due process. Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006).

### A. Connison Howard's Testimony

As discussed above, Howard, Shannon's father, was asked at trial how he felt about Smith and Robert, who were given immunity in exchange for their testimony. Sheckles objected on relevancy grounds, but the trial court permitted Howard to answer:

21

"I really don't give a d\*mn about the other two people that you all give immunity to. The only thing I'm worried about is the man that shot my daughter and shot [Larry]. He's the one that I want." Tr. p. 548.

Sheckles challenges this statement as improper opinion evidence, inasmuch as Howard was not an eyewitness to the murders. Sheckles emphasizes that the light in which to view Howard's statements is that he did not care about Smith and Robert, to whom immunity had been granted. Rather, Howard was concerned only with the shooter, who was on trial. Sheckles further explains that this "can only mean that he was telling the jury that [Sheckles] was guilty, and to convict [Sheckles] and give him what he deserved." Appellant's Br. p. 35.

Here, Howard's statements were improper opinion testimony, insofar as there was no foundation to support a finding that Howard had personal knowledge regarding the identity of the shooter. See Ind. Rules of Evid. 602 & 701 (providing that evidence must be introduced that the witness has personal knowledge of the matter and that lay witnesses may only give opinion testimony that is rationally based on the perception of the witness). Nevertheless, "[t]he improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." Lafayette v. State, 917 N.E.2d 660, 666 (Ind. 2009).

Here, Smith testified that Sheckles was the shooter. Tr. p. 795-96. Additionally, Sheckles's DNA was found at the murder scene, and he engaged in corroborating acts

22

after the murders had been committed. Id. at 611; 724-30. Consequently, the admission of Howard's testimony did not amount to fundamental error.

## B. Robert's Conduct

As stated above, at trial, the State put Robert on the stand, believing that he would testify pursuant to a plea agreement and a grant of immunity. Robert took the stand and testified that he had a plea agreement and would testify truthfully. However, Robert unexpectedly refused to testify; and, with a myriad of profanities, declared that he would not testify, that he was forced to sign a statement, and that did not recognize his plea agreement. Robert attempted to leave the courtroom several times before the trial court sent the jury out of the courtroom.

Sheckles argues that fundamental error resulted when the trial court failed to "remove the jury promptly upon the first sign of trouble" and to admonish the jury after afterwards. Appellant's Br. p. 35. Sheckles claims that this error was compounded when the prosecutor linked Robert and Sheckles during closing argument by stating that they were "as tight as they can be." Tr. p. 943.

Sheckles directs this Court to Illinois v. Allen, 397 U.S. 337 (1970), in support of his argument that Robert's disregard of courtroom decorum deprived him of a fair trial. The Allen Court held that when faced with an unruly defendant, there are at least three constitutionally permissible ways to handle the situation and still preserve a defendant's right to be present at his own trial: (1) bind and gag him, thereby keeping him present;

23

(2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly. Id. at 344-45.

Here, unlike in Allen, it was a witness, rather than the defendant, who was unruly; and the trial court attempted to calm him down and restore order, but finally removed the jury from the courtroom when he could not be persuaded to act with decorum. Because Robert was to be a witness for the State, his sudden refusal to testify was a setback for the State. Accordingly, this case is unlike Allen, and no fundamental error occurred on this basis.

As for the prosecutor's statements during closing argument, fair comment on the evidence is acceptable during closing argument. Coleman v. State, 946 N.E.2d 1160, 1167 (Ind. 2011). In this case, the prosecutor's statements are supported by Smith's testimony that she hardly ever saw Robert without seeing Sheckles. Tr. p. 773. Consequently, this also argument fails.

## V. Failure to Allow Impeachment

Sheckles argues that the trial court's failure to allow him to cross-examine Smith on her arrest for giving false information was an improper restriction on his right to confrontation under the Sixth Amendment to the United States Constitution and Article I, Section 13 of the Indiana Constitution. As stated above, trial courts are given broad discretion in determining whether to admit or exclude evidence, and appellate courts review evidentiary determinations by trial courts only for an abuse of discretion. Conrad, 938 N.E.2d at 855.

A "criminal history [] offered as general impeachment of character" is not permitted under the Rules of Evidence unless the criminal history consists of certain crimes reduced to convictions. Hatchett v. State, 503 N.E.2d 398, 404 (Ind. 1987). Nevertheless, disallowing evidence of bias or motive to lie on the part of a witness can deprive a defendant of his Sixth Amendment right to confrontation. Hendricks v. State, 554 N.E.2d 1140, 1143 (Ind. Ct. App. 1990), aff'd in pertinent part, 562 N.E.2d 725, 729 (Ind. 1990).

Notwithstanding a criminal defendant's general right to cross-examine the witnesses against him, The Confrontation Clause guarantees an opportunity for effective cross-examination rather than to cross-examination that is effective as the defense defines it. Oatts, 899 N.E.2d at 722. Additionally, violations of the right to cross-examine are subject to harmless error analysis. Smith v. State, 721 N.E.2d 213, 219 (Ind. 1999).

Here, Smith's credibility was impeached by her other conviction for shoplifting or conversion, her pending charges of battery and possession of a controlled substance, and the plea agreement under which she was testifying. Therefore, any error in the trial court's refusal to permit the defense to cross-examine Smith on her arrest for giving false information was harmless error.

## VI. Sentence

Sheckles challenges the 120-year sentence that was imposed following his convictions. Although Sheckles frames his argument as a Rule 7(B) challenge, the

25

substance of his argument is that the trial court abused its discretion for failing to find his below-average intelligence as evidenced by his low IQ of 56 as a mitigating factor.

Sentencing decisions rest within the trial court's sound discretion and are reviewed on appeal only for an abuse of that discretion. Anglemyer v. State, 868 N.E.2d 482, 490 (Ind. 2007), clarified on reh'g, 875 N.E.2d 218 (2007). Trial courts are required to enter sentencing statements whenever imposing a sentence for a felony offense. 868 N.E.2d at 490. The statement must include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence. Id. If the recitation includes the finding of aggravating or mitigating circumstances, then the statement must identify all significant mitigating and aggravating factors and explain why each circumstance has been determined to be mitigating or aggravating. Id. A trial court may abuse its discretion by entering a sentencing statement that includes reasons for imposing a sentence not supported by the record, omits reasons clearly supported by the record, or includes reasons that are improper as a matter of law. Id. at 490-91.

Sheckles directs this Court to Young v. State, 696 N.E.2d 386 (Ind. 1998), in support of his argument that the trial court abused its discretion when it failed to consider his intellectual capacity when it sentenced him. In Young, our Supreme Court noted that the trial court had determined that the defendant could not be sentenced to life in prison without the possibility of parole because he functioned with the mental capacity of a child. Id. at 391. Nevertheless, the trial court had sentenced the defendant to 195 years, which our Supreme Court opined "virtually imposed life without parole anyway." Id. at

26

392. Moreover, the <u>Young</u> Court stated that "the trial court should have given this mitigator some weight in the sentence." <u>Id.</u>

In response, the State directs this Court to <u>Jimmerson v. State</u>, 751 N.E.2d 719 (Ind. Ct. App. 2001), where a panel of this Court compared a claim of alleged limited intellectual capacity as a mitigating circumstance to a claim of mental illness. <u>Id.</u> at 725. The panel then reiterated the considerations that bear on the weight that should be given to mental illness, and by comparison, limited intellectual capacity, in sentencing including: (1) the extent of the defendant's inability to control his behavior due to the disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission of the crime. <u>Id.</u> Moreover, "a court does not err in failing to find mitigation when a mitigation claim is 'highly disputable in nature, weight, or significance.'" <u>Id.</u> (quoting <u>Smith v. State</u>, 670 N.E.2d 7, 8 (Ind. 1996)).

This case can be distinguished from <u>Young</u>. In <u>Young</u>, our Supreme Court pointed out that Young functioned with the mental capacity of a child, and even more compelling, the trial court determined that Young was mentally retarded pursuant to Indiana Code section 35-36-9-2. 696 N.E.2d at 391.

By contrast, the only evidence that Sheckles was mentally challenged was an IQ test that he took at the age of thirteen when his school behavior was "characterized by acting out/aggressive type behaviors." PSI Supp. p. 7. Moreover, there is no indication in the record that Sheckles's lowered IQ has rendered him incapable of normal

27

functioning. Accordingly, Sheckles has failed to establish a nexus between his alleged diminished intellectual capacity and his crime. Consequently, the trial court did not err by not considering Sheckles's lowered IQ a mitigating circumstance, and we affirm the decision of the trial court.

The judgment of the trial court is affirmed.

DARDEN, J., and KIRSCH, J., concur.