ATTORNEYS FOR APPELLANT
Jason J. Pattison
Madison, Indiana

Alison T. Frazier
Madison, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Joby D. Jerrells
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Apr 27 2010, 3:17 pm

*CLERK*
of the supreme court,
court of appeals and
tax court

## In the
## Indiana Supreme Court

No. 39S01-0907-CR-309

GARY DENNIS JACKSON,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Jefferson Circuit Court, No. 39C01-0609-FB-90
The Honorable Ted R. Todd, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 39A01-0711-CR-528

**April 27, 2010**

**Boehm, Justice.**

The trial court declared a mistrial after interviewing jurors regarding their exposure to a newspaper article reporting a letter written by the defendant to the prosecution. The Court of Appeals reversed the defendant's conviction by a newly impaneled jury. The Court of Appeals found insufficient grounds to discharge the earlier jury, and therefore ruled the trial by the new jury violated the double jeopardy clause of the Fifth Amendment. We hold that the trial court's determination of the need to discharge the earlier jury is entitled to deference and was not an abuse of discretion on this record. Accordingly, we affirm the conviction.

**Facts and Procedural History**

On September 12, 2006, Officer Christopher Strouse of the Madison Police Department was dispatched to Ben Smith's apartment on Walnut Street in Madison. When Officer Strouse arrived, he found Smith and Harold Centers in the apartment and Gerald "Bubby" Roberts lying on a mattress with dried blood on it. Paramedics were called to the scene and failed to revive Roberts, who was pronounced dead at a local hospital.

Witnesses alleged that Gary Jackson and Roberts had had a physical altercation at Smith's apartment the day before. Jackson was subsequently charged with aggravated battery, a Class B felony, and as a habitual offender. Jackson's first trial in December of 2006 ended in a hung jury.

The jury for the second trial was sworn on April 23, 2007. That same day, a local newspaper ran an article about the trial which contained an excerpt from a letter Jackson had written to the prosecutor trying his case. The article quoted Jackson as writing:

> I know my life to you doesn't mean anything, just another poor black man the state can clean-up the book on. I can understand you feeling that way, but at least give Bubby Roberts' family peace by telling them the truth. They deserve that.

The next day, April 24, the state requested a mistrial. The court first identified five jurors who acknowledged they had been exposed to the article, then conducted individual <u>voir dire</u> of the five. One juror had read the first few sentences of the article but stopped when he remembered the judge's instruction to avoid media coverage of the trial. Two had read the entire article but stated that they had not formed an opinion about the case. Two others stated that their spouses had started to read the article aloud, but the jurors told the spouses to stop, and one spouse responded that he knew Roberts. All five testified that exposure to the article would not affect their decision in the case.

The State argued that a mistrial was required because an admonishment to the jury could not overcome the prejudice against the State created by the article. Specifically, the State argued that Jackson's letter implied that he was prosecuted because of his race, and that the State was not telling the truth and would not do so at trial. Jackson replied that there was no prejudice because the five jurors each testified that the article had not caused them to form an opinion.

The court agreed that neither Jackson nor his counsel had anything to do with the article. The court also accepted Jackson's claim that the jurors denied any bias, but added, "That's not my issue in my head," and granted the State's motion for mistrial.

A third jury trial began in June 2007. After hearing various accounts of an encounter between Jackson and Roberts, the jury found Jackson guilty of battery resulting in serious bodily injury, a Class C felony. The trial court imposed a sentence of eight years for the battery. A habitual offender finding was entered but the Court of Appeals stayed Jackson's appeal to permit him to pursue post-conviction relief as to that issue, and the habitual offender finding was vacated. Jackson v. State, 903 N.E.2d 542, 546 (Ind. Ct. App. 2009).

After the post-conviction relief was granted, the appeal was resumed. The Court of Appeals reversed Jackson's conviction, finding that the trial court abused its discretion in granting the mistrial and a retrial of Jackson was therefore barred by double jeopardy. Id. at 548–49. We granted transfer.

**Discussion**

Jackson argues that the trial court abused its discretion in granting a mistrial, so the subsequent trial violated the prohibition against double jeopardy found in both the Federal and Indiana Constitutions. Jackson also argues that the trial court erred in excluding as hearsay a paramedic's testimony reporting a bystander's account of how Roberts was injured. Last, Jackson contends that the evidence was insufficient to support his battery conviction.

As a threshold matter, the State contends that Jackson waived his challenge to the mistrial by failing to object to the trial court's grant of the mistrial. Jackson opposed the State's motion for mistrial and argued before the trial court that a mistrial was inappropriate because the jurors exposed to the article all attested that they were not influenced by it. This brought the issue to the trial court's attention. An objection after the trial court ruled would have been in substance a motion to reconsider a matter that was fully argued. This is not required to avoid waiver. See Ind. Trial Rule 46. We agree with the Court of Appeals that this was sufficient to preserve the issue for appeal. Jackson v. State, 903 N.E.2d 542, 546 (Ind. Ct. App. 2009).

## I. Double Jeopardy

The Fifth Amendment prohibits the State from placing a defendant in jeopardy twice for the same offense.[1] Brown v. State, 703 N.E.2d 1010, 1015 (Ind. 1998) (citing Benton v. Maryland, 395 U.S. 784 (1969)). Jeopardy attaches when a jury has been selected and sworn. Crim v. State, 156 Ind. App. 66, 75, 294 N.E.2d 822, 828 (1973). Once jeopardy has attached, the trial court may not grant a mistrial over a defendant's objection unless it finds a "manifest necessity" for the mistrial. Brown, 703 N.E.2d at 1015 (citing Arizona v. Washington, 434 U.S. 497, 505 (1978)). Absent this finding, a mistrial operates as an acquittal to bar further prosecution. Id. (citing Wright v. State, 593 N.E.2d 1192, 1196 (Ind. 1992)). We review a grant of mistrial for abuse of discretion. Id.

Justice Story introduced "manifest necessity" as the standard for discharging a jury in United States v. Perez, 22 U.S. (9 Wheat.) 579 (1824). He explained that it authorized a trial court to discharge a jury when:

> [T]aking all the circumstances into consideration . . . the ends of public justice would otherwise be defeated. [The trial court is] to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes . . . .

Id. at 580. The Supreme Court explained this standard in Arizona v. Washington, where the defendant challenged the trial court's declaration of a mistrial for comments made during defense counsel's opening statement. 434 U.S. at 498. The Court acknowledged the difficulty in measuring jury bias and made clear that manifest necessity does not mean a mistrial had to be "necessary" in "a strict, literal sense." Id. at 511. Justice Story's words "do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge." Id. at 506. Rather, only a "high degree" of necessity is required to conclude that a mistrial is appropriate. Id. The Court recognized that "some trial judges might

---

[1] Jackson contends that both the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution and Article 1, § 14 of the Indiana State Constitution barred his third trial. The cases that Jackson cites, however, are either federal cases or Indiana cases interpreting federal law. Because Jackson does not provide any authority or argument supporting a separate standard under the Indiana Constitution, his state constitutional claim is waived. Brown v. State, 703 N.E.2d 1010, 1015 & n.4 (Ind. 1998).

have proceeded with the trial after giving the jury appropriate cautionary instructions." Id. at 511. Nonetheless, the Court held that the reviewing court must "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." Id. Accordingly, the Court deferred to the trial court's decision, even though the trial court failed to make "an explicit finding of 'manifest necessity'" or state that it "had considered alternative solutions and concluded that none would be adequate." Id. at 501, 516.

Many different factors may bear on the need for a mistrial. First, it is significant whether the reason for the mistrial is attributable to the prosecution. Brown, 703 N.E.2d at 1015. If so, the State must demonstrate a "much higher" degree of necessity for the mistrial. Id. at 1015–16 (citing Corley v. State, 455 N.E.2d 945, 950–51 (Ind. 1983); Burton v. State, 510 N.E.2d 228, 229 (Ind. Ct. App. 1987)). This heightened standard is derived from a natural concern that a party seeking a mistrial may be motivated by a belief that its case is not being well received. This rule has been codified at I.C. § 35-41-4-3(b), which bars a subsequent prosecution if the prosecutor caused any specified circumstances with the intent to terminate the trial.

The necessity of a mistrial is also evaluated in light of the steps taken by the trial court to avoid a mistrial. E.g., United States v. Charlton, 502 F.3d 1, 5 (1st Cir. 2007) (considering the following factors: whether the trial court provided counsel an opportunity to be heard, whether the trial court considered alternatives to a mistrial, and whether the trial court's decision was made after adequate reflection). The burden imposed by a mistrial is also relevant. In Brown, we recalled the values underlying the protection against double jeopardy—the burden on the accused, the associated stigmatization as one accused, and the increased risk of wrongful conviction. Brown, 703 N.E.2d at 1016 & n.5. Double jeopardy jurisprudence balances these values against society's interest in allowing the prosecution "one complete opportunity for a conviction." Id. (citing Washington, 434 U.S. at 509). Accordingly, we recognized that these values "are not as great when the trial is terminated shortly after jeopardy has attached as opposed to at a later stage in the trial." Id.

Here, five of the twelve jurors were exposed to an article citing Jackson's letter implying that he was prosecuted because of his race and that the prosecutor had not been truthful in

dealing with the victim's family. The appearance of the letter in the newspaper was not attributable to either party. Although all jurors who admitted to having seen the article testified that they were not influenced by it, the trial court is in the best position to evaluate this testimony. See Washington, 434 U.S. at 511, 514–15 (according the "highest degree of respect" to the trial court's evaluation of possible juror impartiality). We do not agree with Jackson that the trial court was required to make explicit findings or give explanations as to the reason for the mistrial. Indeed, Washington holds to the contrary. Id. at 501, 516–17. Nor was the trial court required to admonish the jury or attempt other curative measures before declaring a mistrial. Id.

The trial court's decision is bolstered by the fact that the jurors were exposed to the article the same day they were impaneled and the mistrial was declared the next day. This was before any evidence was introduced, and even before opening statements. As in Brown, where the mistrial was declared after the opening statements but before evidence was introduced, "the danger of unfairness posed by a new trial was not great." Brown, 703 N.E.2d at 1016 & n.5; accord Washington, 434 U.S. at 510–11 (granting a mistrial after the opening statements). Under all of these circumstances, we cannot say the trial court's ruling ordering a new trial was an abuse of discretion.

## II. Exclusion of Evidence

Jackson claims that the trial court erred in excluding a paramedic's testimony that, while he was treating Roberts in Smith's apartment, an unidentified bystander stated that Roberts "jumped up and yelled something, fell, striking his head on the wall." Jackson contends that this statement was admissible either as one for the purposes of medical diagnosis or treatment under Indiana Evidence Rule 803(4) or as a prior inconsistent statement for impeachment purposes under Indiana Evidence Rule 613.

The paramedic's account of the bystander's statement was plainly hearsay, and was inadmissible unless an exception applied. Evid. R. 802. Rule 803(4) provides an exception for statements made "for the purpose of medical diagnosis or treatment." It permits accounts of statements by a person needing medical treatment, but not statements attributed to the treating professional. Sibbing v. Cave, 922 N.E.2d 594, 598 (Ind. 2010) (citing McClain v. State, 675 N.E.2d 329, 331 (Ind. 1996)). In some cases, "statements by others, most often close family

6

members, may be received if the relationship or the circumstances give appropriate assurances" as to the statements' reliability. 2 McCormick on Evidence § 277, at 286 (Kenneth S. Broun et al. eds., 6th ed. 2006). It is not obvious that this statement, whoever made it, was made for the purpose of diagnosis or treatment. In any event, there is nothing in the record to support Jackson's claim that the unidentified bystander was in some close relationship to Roberts such that this statement can enjoy the confidence of reliability required by Evidence Rule 803(4).

Jackson also claims that the statement was admissible as a prior inconsistent statement under Evidence Rule 613. Rule 613 allows the use of a prior inconsistent statement to impeach a witness, and when so used, the statement is not hearsay. Martin v. State, 736 N.E.2d 1213, 1217 (Ind. 2000). This rule permits prior inconsistent statements by the person being impeached. Id. Here, Jackson sought to introduce the paramedic's testimony to impeach Smith's denial that he made the statement. But Jackson did not establish that Smith was the declarant of this unattributed statement. The trial court was therefore correct in excluding the paramedic's testimony.

### III. Sufficiency of Evidence

Jackson challenges the sufficiency of the evidence to support his conviction for Class C felony battery resulting in serious bodily injury. Specifically, Jackson claims the evidence does not establish that Jackson caused Roberts's injuries. The standard of review for sufficiency-of-evidence claims is well settled. We do not reweigh the evidence or judge the credibility of the witnesses, and respect "the jury's exclusive province to weigh conflicting evidence." Alkhalidi v. State, 753 N.E.2d 625, 627 (Ind. 2001). We "consider only the probative evidence and reasonable inferences supporting the verdict." McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005). We affirm "if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." Tobar v. State, 740 N.E.2d 109, 111–12 (Ind. 2000).

To convict Jackson of Class C felony battery, the State was required to prove that Jackson "knowingly or intentionally" touched Roberts in "a rude, insolent, or angry manner," resulting in "serious bodily injury." I.C. § 35-42-2-1(a)(3). At trial, Smith and Garry Campbell testified that in the early afternoon of September 11, 2006, they were drinking with Jackson in

7

Smith's apartment. Smith testified that Jackson was "very angry" at Roberts and said he was going to "whoop" Roberts for stealing from him. A few hours later, Roberts and Tim High showed up at the apartment and joined in the drinking. Smith, Campbell, and High all testified that Jackson got into a heated argument and then a fight with Roberts. High testified that Jackson hit and kicked Roberts multiple times, and was "basically stomping him." Smith testified that Jackson hit Roberts in the face, kicked him in the head and stomach, and "stomp[ed] on" him. Campbell testified that Jackson struck Roberts with his fist a few times, knocked him to the mattress, and "started kicking him any way he could." Campbell also testified that Roberts hit his head when he fell onto the mattress. When Jackson was finished, Roberts was bleeding from the mouth, and both Smith and Campbell observed blood on the wall by the mattress. Neither Smith nor Campbell observed Roberts getting up or speaking after the fight. Roberts ultimately died from injuries related to a blunt force trauma to the head. This evidence, if credited, is sufficient to convict Jackson of battery resulting in serious bodily injury.

Jackson notes that Roberts's DNA was found on Smith's shoes, but not on Jackson's boots. High testified that Smith and Jackson both kicked Roberts. This may suggest that Smith also battered Roberts, but does not exculpate Jackson.

### Conclusion

Jackson's conviction and sentence are affirmed.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.

8