**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**JEFFREY G. RAFF**
Deputy Public Defender
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

FILED

Feb 22 2012, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LADAWN D. JOHNSON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A04-1106-CR-271 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No. 02D06-1012-FA-62

**February 22, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant LaDawn D. Johnson appeals her conviction and sentence for Battery,[1] a class A felony. More particularly, Johnson argues that the evidence is insufficient to prove that the battery she committed resulted in the death of her nearly one-month-old daughter. Additionally, Johnson argues that her forty-year sentence is inappropriate in light of the nature of the offenses[2] and her character. Concluding the evidence to be sufficient for a reasonable jury to conclude that Johnson battered her infant daughter to death and that she was appropriately sentenced, we affirm the decision of the trial court.

## FACTS

On the morning of December 9, 2010, Johnson brought her twenty-nine-day-old baby and her three other children to the home of Pauline Rothgeb and Patricia Jackson. Rothgeb and Jackson were Johnson's friends and had babysat for her other children in the past. Johnson told Rothgeb that she thought her baby was dead, and Jackson called the Fort Wayne Police Department (FWPD). A responding officer moved the baby into the residence to render medical attention. Medics arrived shortly thereafter and moved the baby to an ambulance where they pronounced her dead.

The infant had obvious injuries to her face and chest. Specifically, "[b]oth areas appeared to be injured by some type of burn and were in different stages of healing." Appellant's App. p. 12. An autopsy revealed that the cause of death was a skull fracture;

---

[1] Ind. Code § 35-42-2-1.

[2] Johnson was also convicted of class C felony neglect of dependant but does not challenge that conviction on appeal.

the infant also had fractured ribs and an unidentified substance in her stomach. Dr. Shruti Shukla, a pathologist, stated that the burn to the chest appeared to have come at a different time than the burn to the facial area. The child's death was ruled a homicide.

Later that day, FWPD officers brought Johnson to the police station for an interview. After being advised of her Miranda[3] rights, Johnson stated that "no other adult ha[d] been around her child since Thanksgiving and that [the day before] she had slipped and fell while carrying the child." Appellant's App. p. 12. Johnson explained that the burn to the baby's face occurred when one of her other children turned on the hot water while she was trying to clean the baby and that the burn to the baby's chest occurred during a bath two days before. Johnson could not explain her infant's fractured skull or ribs and said that she had not taken her baby for medical treatment for any of the aforementioned injures; indeed, her daughter had not been seen by a doctor since birth.

On December 15, 2010, Johnson was charged with Count I, class A felony battery; Count II, class A felony neglect of a dependent; and Count III, class C felony neglect of a dependent. On April 13, 2011, the case proceeded to a jury trial.

During trial, Jackson and Rothgeb testified that they did not know Johnson was pregnant until she was "four" to "six months" along. Tr. p. 90, 101. Jackson and Rothgeb saw the baby when they picked them up from the hospital. Neither Jackson nor Rothgeb saw mother or daughter until the morning of December 9, even though Rothgeb had taken her daughter to visit them. Johnson would not let them see the baby,

---

[3] Miranda v Arizona, 384 U.S. 436 (1966).

explaining that she had just put her to bed. Rothgeb had several telephone conversations with Johnson, during which Johnson never "express[ed] concern about any injuries [the baby] had or any problems that she was having." Id. at 110. When asked, Johnson admitted that she had failed to take the baby to her two-week check-up. Recognizing Johnson's familial and financial difficulties, Rothgeb offered to help Johnson find adoptive parents for the baby or to find someone to "take the baby until [Johnson] could . . . get on her feet," but Johnson refused. Id. at 116-18.

Daniel Schmitt, a medic, testified that he observed bruising to the baby's right eye, a burn on her left lower chin, a cut on her face, a burn on her chest "that looked like it had some kind of ointment on it" and was covered with what appeared to be toilet paper; he did not detect any signs of life. Tr. p. 128-31. Schmitt opined that the burn on the baby's chest was inconsistent with Johnson's explanation that the baby "got burned in the bathtub," and was consistent with burning "with an object because it was deep, it was rounded and because of the fact that there was no splatter." Id. at 131-32, 135.

A second medic, Matthew Peckham, testified that Johnson was not able to "give any specifics" for her two explanations for the baby's injuries and that he observed "some mottling and tinting of the skin which is typical for a patient that's been deceased for some time." Tr. p. 141-42. A third medic, Ken Hendricks, also testified that he:

> [n]oticed there was some redness under the right eye lid, a small abrasion or possible scab to the right . . . nostril. Bottom lips were purple, possible blisters or raised area along the bottom lip line. Had a toilet paper on the neck area that was covering an abrasion, a burn type area on the chest approximately one and a half inches by three inches, rectangular shape that

4

was located between the nipples with redness or pink color noted along with a dime sized burn abrasion area on the chin and neck area to the patients [sic] left side. Also had some blue or purplish discoloration marks on the back.

Id. at 152. All three medics testified to observing rigor in the baby's jaw or limbs, which suggested that the baby had been dead for some time.

The maintenance supervisor of Johnson's apartment testified that Johnson and her children had to leave the apartment on December 9, 2010, for some maintenance work. Before that date, Johnson had complained about the water heater leaking, but had not complained about it being too hot. Bradley McCormick, a maintenance man, who worked on the exterior of Johnson's apartment for two weeks, testified that he heard a baby crying "pretty much the whole time," that "[t]he baby cried constantly . . . all day pretty much," that the cry was of the "[d]istress" kind, that it did not "seem that anybody was attending to that cry," and he "[n]ever saw anybody come or go." Tr. p. 171-74.

Tamekia Neal, the only person in the neighborhood to whom Johnson talked, testified that before the baby's birth, Johnson repeatedly said that she did not want the baby and discussed putting up the baby for adoption. Neal also testified that Johnson failed to attend doctor's appointments as necessary. After the baby was born, Johnson "showed" that she did not want her in various ways. Id. at 79. For example, when Johnson was asked how many children she had, she answered, three. Neal's offer to help Johnson with the baby was refused. Neal saw the baby a "couple weeks" after she was born; the baby looked like "somebody had hit her a couple of times in the face. She was

5

just . . . I don't know, she was just like a baby and just her eyes were different." Tr. p. 180. When Neal asked "[h]ow did the baby['s] eyes get so dark," Johnson responded that her "kids had hit her." Id. Neal observed that the baby's "mouth had a lot of like thick saliva . . . I don't know, she didn't look like a happy . . . like a baby, something was wrong with her." Id. at 181. On later occasions, when Neal would ask to see the baby, Johnson would refuse saying that the baby was upstairs. Neal concluded her testimony by stating that she did not believe that Johnson "had an attachment to the baby at all" and that Johnson did not "even give that baby a chance." Id. at 198.

Johnson's six-year-old son testified:

Q: Well let me ask you this. Did you ever see your mom do something bad to Alyssa?

A: Yep.

Q: What did you see?

A: I see her punch her in the stomach?

Q: You saw her punch her in the stomach?

A: Yep.

Q: What else did you see []?

A: I seen her said her [sic] was ugly and then her [sic] bend her knee . . .

Q: [W]hen you saw your mom bending Alyssa's legs, did you ever say anything to her?

A: Yep.

Q: What did you say?

6

A: I said stop.

Q: You said stop. And did she stop?

A: No.

Tr. p. 209-12.

Doris Clark, Johnson's mother, testified that Doris saw the baby when Johnson and she returned from the hospital. Clark explained that Johnson had a regular delivery with no complications and that the baby appeared "normal." Id. at 217. Clark stated that the other children "loved" the baby and that the oldest "was really excited." Id. at 221. Johnson never told Clark about any injuries, bruises, or burns that the baby had received.

Johnson's stepfather, Jerome Clark, testified that she did not inform him that she was pregnant until she had delivered the baby. Jerome asked about the baby each time he visited and attempted to see her on December 8, but Johnson refused.

Dr. Shukla testified regarding the details of the baby's autopsy, which was performed before noon on December 9. The baby's skin and eyes exhibited signs of dehydration. The baby's forehead, cheek, and nose showed two-week healed abrasions or burns, and deep scarring. There were some bruises to her nose and below her right eye. The baby's chin and upper chest suffered two-day-old second degree, or "the most painful," burns. Tr. p. 260. There were some "recent" bruises on her back and side. Id. at 263. The baby suffered subdural and skull hemorrhaging and a skull fracture, caused by "very hard impact . . . because their skull[s are] more resilient"; some hemorrhaging

7

was "at least [] 48 or 72 hours old," some was "within the 48 [hour] range," and some was "within the 24 hour range." Id. at 264-69. Dr. Skula testified that the skull facture occurred "[a]round 24 hours or less than 48 hours." Id. at 269. Dr. Skula opined that the cause of death was a homicide, from the "[f]racture of skull with subdural and sub-arachnoid hemorrhage." Id. at 272-73. Dr. Skula stated that "external force was used to give rise to this injury" and that he did not think that a "fall can give rise to this much of injury." Id. at 273. The baby also had rib fractures, some of which were a little more than ten days old and some of which were between twenty-four and forty-eight hours old. Id. at 269. Dr. Skula testified that the aforementioned injuries would have been "obvious to an individual around her" and that prompt medical treatment could have prevented the baby's death. Id. at 274.

The social worker who interviewed Johnson testified that Johnson "had an unusual disposition for a mother who just realized that her child was dead. . . . She was not hysterical, she did cry, but nothing to lead me to believe that she was traumatized by this situation." Tr. p. 301.

Luther Morehead, the father of Johnson's third child, testified that he visited Johnson's apartment about three times after the baby was born. Every time he visited, Morehead asked Johnson if he could see the baby, but she refused, saying that he "didn't

8

think it was [his] anyway." Tr. p. 363. At trial, the identity of the baby's father was unknown, but Morehead was "doing it on [his] own to establish paternity." [4] Id. at 366.

After the State rested, Johnson took the stand in her own defense. She admitted that it was her responsibility to care for her deceased infant daughter. Johnson could not fully explain or give details as to the circumstances that caused the baby's visible injuries. The jury, following a three-day trial, found Johnson guilty on all counts.

A sentencing hearing was held on May 16, 2011. The trial court observed that Johnson had a choice, inasmuch as she had friends and family who were willing to help her, but instead, she chose to kill her child. Additionally, the trial court noted that some of the acts occurred in front of Johnson's other children and that at least her oldest son was aware of what was happening. However, the trial court observed that Johnson had been a good mother to her other children, noting that they were clean, well-behaved, and well taken care of. The trial court also stated that it was "not concerned about a couple of juvenile records or even marijuana possession in 2008," emphasizing that this "sentence is truly about this offense." Sent. Tr. p. 16. Finally, the trial court noted that while there was some emotional issues going on, there was nothing to suggest that "those emotional issues were beyond those of normal pregnancy and childbirth." Id.

---

[4] Morehead would establish paternity over the deceased child by Johnson's sentencing hearing on May 16, 2011, where he gave a statement that he was "more hurt than anything because [he] never got to see [his] daughter alive." Sent. Tr. p. 9.

The trial court merged Count II into Count I and entered a judgment of conviction on Counts I and III. The trial court sentenced Johnson to forty years incarceration on Count I and to a concurrent term of five years on Count III. Johnson now appeals.

DISCUSSION AND DECISION

I. Sufficiency of the Evidence

Johnson argues that the evidence was insufficient to convict her of class A felony battery. When reviewing the sufficiency of the evidence, this Court neither reweighs the evidence nor judges the credibility of witnesses. Jackson v. State, 925 N.E.2d 369, 375 (Ind. 2010), reh'g denied. Instead, we will consider only the probative evidence supporting the verdict and the reasonable inferences to be drawn from that evidence. Id. Moreover, this Court will affirm if the probative evidence and reasonable inferences could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. Id.

> Indiana Code section 35-42-2-1 provides, in relevant part, that
>
> [a] person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a Class B misdemeanor. However, the offense is . . . a Class A felony if it results in the death of a person less than fourteen (14) years of age and is committed by a person at least eighteen (18) years of age.

Johnson concedes that there is direct evidence that she battered her baby, inasmuch as her son testified to witnessing abuse but argues that there is no evidence that the battery observed by her oldest son resulted in the death of her baby.

10

In this case, Dr. Shukla testified that the cause of death was a skull fracture, that a skull fracture on an infant required a "very hard impact," and that a fall as described by Johnson could not have caused the fracture that the baby suffered. Tr. p. 266, 272-73. Dr. Shukla also opined that the baby's forehead, cheek, and nose showed two-week healed abrasions or burns and deep scarring. The baby's chest suffered a two-day-old second degree burn. The most recent bruises were on the baby's back and side. Similarly, a medic testified that there was a small abrasion on the baby's right nostril, that toilet paper was covering a burn on the baby's chest, that there was another burn on the baby's chin and neck, and blue or purple discoloration marks on her back. Id. at 152

Neal, Johnson's neighbor, testified that Johnson never really bonded with the baby and that she had repeatedly stated that she did not want the baby. Neal opined that when she saw the baby a few weeks after she was born, she looked like "somebody had hit her a couple of times in the face." Id. at 180. Additionally, friends and family testified that when they requested to see the baby, Johnson would refuse their requests. Indeed, Morehead, the father of the child, was never permitted to see the baby. Under these facts and circumstances, the jury could reasonably infer that Johnson committed battery against her infant daughter that resulted in the child's death. Consequently, this argument fails.

## II. Appropriateness of Sentence

Johnson argues that her sentence is inappropriate in light of the nature of the offenses and her character pursuant to Indiana Appellate Rule 7(B) (Rule 7(B)). It is well

established that sentencing is within the trial court's sound discretion and should receive considerable deference. Cardwell v. State, 895 N.E.2d 1219, 1222 (Ind. 2008). Nevertheless, the Indiana Constitution authorizes independent appellate review and revision of sentences, which is implemented through Rule 7(B). Carroll v. State, 922 N.E.2d 755, 757 (Ind. Ct. App. 2010), trans. denied. In reviewing a sentence under Rule 7(B), "[u]ltimately the length of the aggregate sentence and how it is to be served are the issues that matter." Sanchez v. State, 938 N.E.2d 720, 722 (Ind. 2010).

Johnson was convicted of a class A felony and a class C felony. The sentencing range for a class A felony is twenty to fifty years, with the advisory term being thirty years. Ind. Code § 35-50-2-4. Likewise, the sentencing range for a class C felony is between two and eight years, with the advisory sentence being four years. I.C. § 35-50-2-6. Here, Johnson was sentenced to forty years on her class A felony conviction, which is ten years greater than the advisory, and to four years on her class C felony conviction, which is the advisory sentence. The trial court ordered that the terms to be served concurrently for a total executed term of forty years.

As for the nature of the offenses, Johnson repeatedly battered, tortured, and then failed to seek medical treatment for her defenseless newborn, resulting in the infant's death before she was even one-month old. Johnson refused the offers of assistance from friends, neighbors, and family, who volunteered to help Johnson until her life was more stable. Instead, Johnson chose to take out her frustration, anger, resentment, fear, and whatever negative emotion she was experiencing on her own daughter, who relied on her

12

for safety. Instead of protection, Johnson's daughter suffered cruelty, abuse, and ultimately, death. Needless to say, the nature of the offenses does not aid Johnson's argument that her sentence is inappropriate.

As for Johnson's character, while she does not have an extensive criminal past, the horrific nature of the instant offense is an adequate reflection of Johnson's poor character. As stated above, instead of accepting the help of friends and family, she took the life of her own child. In short, Johnson has failed to convince this Court that her forty-year sentence is inappropriate, and we decline to revise it.

The judgment of the trial court is affirmed.

DARDEN, J., and BAILEY, J., concur.