## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 08 2016, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Anthony G. Boyer,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 8, 2016

Court of Appeals Case No.
39A01-1507-CR-1039

Appeal from the Jefferson Circuit Court.
The Honorable Darrell M. Auxier, Judge.
Cause No. 39C01-1412-F5-1017

**Barteau, Senior Judge**

# Statement of the Case

Anthony G. Boyer appeals from his convictions after a jury trial of Level 5 felony dealing in methamphetamine,[1] and Level 5 felony attempted dealing in methamphetamine.[2] We affirm.

# Issues

Boyer presents the following restated issues for our review:

I. Whether there is sufficient evidence to support Boyer's convictions of dealing in methamphetamine and attempted dealing in methamphetamine; and

II. Whether the trial court abused its discretion by instructing the jury on the defense of abandonment at the State's request and over Boyer's objection.

# Facts and Procedural History

In November of 2014, Justin Brooks and his girlfriend, Brittany Canfield, were working as confidential informants for the Jefferson County Sheriff's Department in exchange for leniency regarding pending matters against each of them. In particular, Brooks was facing a probation violation charge and charges for driving while suspended and fleeing law enforcement. He faced those charges while also serving probation for a 2004 conviction of dealing in cocaine. Additionally, Brooks was in arrears with his child support obligation.

---

[1] Ind. Code § 35-48-4-1.1 (2014).

[2] Ind. Code § 35-48-4-1.1 (2014) (dealing); Ind. Code § 35-41-5-1 (2014) (attempt).

Brooks had conducted approximately ten or twelve controlled buys using money given to him for that purpose, while Brittany had conducted three or four controlled buys.

[4] On November 12, 2014, via text and telephone, Brooks and Boyer discussed the sale of methamphetamine. The two agreed that Boyer would sell a half gram of methamphetamine to Brooks for sixty dollars. The two were to meet in front of the Dollar General Store to complete the transaction. Brooks then notified Jefferson County Sheriff's Department Special Deputy Tim Armstrong and Sheriff John Wallace about the arrangement. He met them and Detective Tonya Colber at a designated location.

[5] Prior to the controlled buy, Deputy Armstrong strip-searched Brooks, fitted him with a concealed wire, and gave him sixty dollars in buy money. Armstrong took Brooks to the location, dropped him off at a spot across the parking lot, and waited for approximately five to eight minutes for Boyer to arrive. Armstrong's vehicle was parked in the parking lot near a bank in order to avoid detection, while Jefferson County Sheriff's Department Captain Keith Hartman and Detective Colber were monitoring the buy in a cover vehicle. Although Brooks was wearing a wire, Armstrong did not have listening capability, and the cover unit was not receiving intelligible audio.

[6] Boyer arrived in a black truck driven by a male Brooks did not know. Armstrong watched the truck pull up and observed Brooks walk over to it. Brooks, who could see Armstrong's vehicle through the driver's side window of

the black truck, walked over to Boyer and dropped the money in Boyer's lap. He did so, instead of handing him the money, because there were so many people nearby. Brooks grabbed the baggie out of Boyer's hands and asked if the drugs were potent. Boyer assured Brooks that they were. Boyer and the other man were discussing a drug user named Kristy Brown, indicating that she had caused them to be late and describing her as being "out of her mind." Tr. pp. 37-38. The entire transaction was completed in approximately two minutes.

[7] After Boyer left in the truck, Brooks walked back into an alley and was picked up by Armstrong approximately twenty feet from the back side of the Dollar General building. Brooks got into the car and gave Armstrong a small, clear, plastic baggie with a white, crystal-like substance in it. Armstrong drove back to an undisclosed location, removed Brooks' wire, strip searched him, and then interviewed him. Brooks identified Boyer as the person who gave him the crystal-like substance. That substance later tested positive as methamphetamine.

[8] On December 1, 2014, Brooks contacted Boyer about buying a half-gram of methamphetamine for sixty dollars. Boyer wanted Brooks to meet him in Hanover. Brooks contacted Armstrong and Sheriff Wallace about the transaction. Brooks was searched and fitted with a recording device prior to the buy. Officers gave him three twenty-dollar bills, which had been previously photocopied, for the purchase.

[9] Based on text message exchanges, Brooks believed the purchase would occur at a trailer court. However, Boyer changed the location for the buy to the Circle K station. Brittany, who knew Boyer, accompanied Brooks on this controlled buy, and was searched prior to the buy by jail matron Libby Hoffman. Undercover police officer Kurtis Wallace drove the two to the Circle K in an unmarked car. Armstrong, Sheriff Wallace, and Hoffman, followed in a cover unit equipped with a listening device.

[10] Officer Wallace saw Boyer at the Circle K station when they arrived there and parked the car near the gas pumps. Brooks and Brittany got out of the car and walked over to Boyer. Although the officers could not see Brooks get out of the vehicle from their location, they listened to the audio transmission from the device Brooks was wearing. Armstrong recognized Brooks' and Boyer's voices on the audio. The three went into the store, where they stayed for several minutes before Brittany left the store and walked back to Officer Wallace's car.

[11] Within a short time, Brooks and Boyer walked out the front door of the station and proceeded around the side of the building to the back. Boyer told Brooks that he had heard Brooks "might be police" and because of that Boyer was going to be cautious. Tr. pp. 55, 57. Boyer told Brooks that he was going to take the money for the methamphetamine, put the drugs in a cigarette pack, and then call Brooks with the location of the cigarette pack. Officer Wallace had lost sight of the two, but Brooks walked back to the car after giving the money to Boyer. Officer Wallace did not see Boyer again at the Circle K station.

[12] Brooks received a text from Boyer indicating that they should just meet each other at the laundromat. Officer Wallace repeated what Brooks told him about going to the laundromat so the information that the investigation was ongoing would be supplied to officers in the area.

[13] Meanwhile, Armstrong, by way of the listening device, had heard a voice say "Sixty. Right?" *Id.* at 141. He then heard Boyer say, "I'm going to have to go over here. I'll meet you in five to ten minutes down by the laundromat." *Id.* at 130. After they parked in front of the laundromat, Brooks waited approximately five to eight minutes before Boyer arrived.

[14] Officer Wallace told Brooks to exit the vehicle when Boyer arrived, and that he and Brittany would remain in the car. He also instructed Brooks to ensure that the transaction was visible, but to return to the car if anything did not seem right about the transaction. Boyer called Brooks to ask him where he was. Brooks indicated that he was at the laundromat, got out of the vehicle, and met Boyer at the corner. Boyer told Brooks "we need to take a ride." *Id.* at 62. Brooks and Boyer walked toward Officer Wallace's car. Brooks entered the front passenger side of the vehicle, while Boyer opened the back driver's side door and began to sit down. Wallace, however, was concerned that Boyer recognized him as a police officer and feared for the safety of the confidential informants. As Boyer began to sit in the back seat, Wallace opened the door, identified himself as a police officer, pointed his gun at Boyer, and ordered him to get out of the car and onto the ground. Additional officers arrived while Boyer was on the ground.

[15] Jefferson County Sheriff's Department Deputy Troy Hawkins arrived at the scene and handcuffed Boyer. Neither the buy money nor drugs were found on Boyer. His cell phone was retrieved during the search. Text messages were later extracted from Boyer's cell phone. During the time leading up to and during this controlled buy, Boyer was exchanging text messages with an individual identified as J.R. He was describing to Boyer his observation from his bedroom about the presence of a vehicle with "tinted out" windows. State's Ex. 15. During Deputy Hawkins' search of Boyer, he also removed six knives from different pockets of Boyer's clothing, and removed a metal rod that Boyer had duct-taped to his forearm.

[16] The State charged Boyer with dealing in methamphetamine, attempted dealing in methamphetamine, and theft. The trial court granted the State's motion to dismiss the theft charge prior to trial and the matter proceeded to trial on the remaining counts. The State tendered a pattern jury instruction on the defense of abandonment, which was given over Boyer's objection. The jury found Boyer guilty on both counts. The trial court sentenced Boyer to five years on each count to be served concurrently. Boyer now appeals.

# Discussion and Decision

## I. Incredible Dubiosity

[17] Boyer challenges the sufficiency of the evidence supporting his convictions citing the incredible dubiosity rule. Upon review of a claim challenging the sufficiency of the evidence, we neither reweigh the evidence nor conduct our

own assessment of the credibility of the witnesses. *Jackson v. State*, 925 N.E.2d 369, 375 (Ind. 2010). We consider only the probative evidence and reasonable inferences therefrom that support the conviction. *Id.* Conflicting evidence is considered in a light most favorable to the trial court's ruling. *Id.* We will affirm if the probative evidence and reasonable inferences drawn therefrom could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

[18] Under the incredible dubiosity rule, however, a court will impinge upon the factfinder's responsibility to judge the credibility of witnesses only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. *Whatley v. State*, 908 N.E.2d 276, 282 (Ind. Ct. App. 2009), *trans. denied.* Application of the rule is limited to cases with very specific circumstances including that the challenged testimony must be given by a sole testifying witness. *Smith v. State*, 34 N.E.3d 1211, 1221 (Ind. 2015).

[19] Here, Brooks was not the only witness offering testimony in support of Boyer's convictions. The November 12, 2014 transaction lasted just a few minutes. Even though the audio equipment rendered no intelligible recording, Brooks' testimony was corroborated by that of Armstrong. Brooks and Boyer agreed that the transaction was to occur at the Dollar General. Deputy Armstrong strip-searched Brooks, fitted him with a concealed wire, and gave him sixty dollars in buy money to purchase a half gram of methamphetamine. Armstrong saw the black truck in which Boyer was a passenger pull into the

parking lot at the Dollar General, and Armstrong saw Brooks walk over to the vehicle. After dropping the buy money in Boyer's lap and grabbing the methamphetamine from Boyer's hand, Brooks met Armstrong and turned over the baggie containing a substance that later tested positive for methamphetamine.

[20] The evidence of Boyer's crime was corroborated and not inherently improbable. Further, the promise of leniency regarding Brooks' pending charges in exchange for Brooks' cooperation does not render his testimony coerced. We have long held that the uncorroborated testimony of an informant-buyer is sufficient to sustain a conviction. *Simmons v. State*, 585 N.E.2d 1341, 1343 (Ind. Ct. App. 1992). Further, the fact that Brooks worked as a confidential informant, hoping to receive some leniency with respect to certain charges against him, was explained to the jury so that his credibility could be evaluated and the weight to be assigned to his testimony could be assessed by them. The evidence is therefore sufficient to support Boyer's conviction for Level 5 felony dealing in methamphetamine.

[21] The December 1, 2014 transaction between Brooks and Boyer similarly was for a half gram of methamphetamine in exchange for sixty dollars. However, because Boyer was suspicious that Brooks was working as a confidential informant, the transaction was set up differently. Brooks was to meet Boyer at the Circle K station. Officer Wallace testified that he watched Boyer meet Brooks after arriving at the Circle K. Armstrong testified that he recognized Brooks' and Boyer's voices on the audio feed and heard a voice saying, "Sixty.

Right?" Tr. p. 141. Armstrong also heard Boyer indicate that he would have to leave for approximately five to ten minutes and then meet at the laundromat. The State also introduced the recording of Boyer instructing Brooks to sit at the laundromat. Therefore, Brooks' testimony was not uncorroborated, and was not incredibly dubious.

[22] Boyer challenges Brooks' testimony claiming that it was coerced. As discussed above, the fact that Brooks hoped for leniency with respect to pending criminal charges does not render his testimony coerced. Further, his incentive to participate in controlled buys was revealed to the jury. Brooks' testimony with respect to this charge is not incredibly dubious. The evidence is sufficient to support Boyer's conviction of attempted dealing in methamphetamine.

## II. Jury Instruction[3]

[23] Boyer argues that the trial court abused its discretion by giving the instruction on the defense of abandonment. We begin our analysis with a recitation of our well-known and often cited standard of review. Our trial courts enjoy broad discretion in the instruction of juries which we review for an abuse of that discretion. *McCowan v. State*, 27 N.E.3d 760, 763 (Ind. 2015). Reviewing a trial court's decision to give or refuse a tendered instruction requires us to examine whether (1) the instruction correctly states the law, (2) there is evidence in the

---

[3] Indiana Appellate Rule 46(A)(8)(e) provides that when "error is predicated on the giving or refusing of any instruction, the instruction shall be set out verbatim in the argument section of the brief with the verbatim objections, if any, made thereto."

record to support giving the instruction, and (3) the substance of the tendered instruction is covered by other instructions which were given. *Bell v. State*, 820 N.E.2d 1279, 1283 (Ind. Ct. App. 2005), *trans. denied.*

[24] Here, the question is whether the trial court properly exercised its discretion in giving the abandonment instruction at the State's request over Boyer's objection. Boyer argues that giving the instruction confused the jury about the element of intent and deprived him of an all-or-nothing defense.

[25] When a defendant is charged with attempting to commit a crime, it is a defense that the person who engaged in the prohibited conduct voluntarily abandoned his effort to commit the underlying crime and voluntarily prevented its commission. Ind. Code § 35-41-3-10 (1977). "[W]hether a defendant's abandonment of a criminal effort is voluntary is a question of fact for the jury to decide." *Gravens v. State*, 836 N.E.2d 490, 495 (Ind. Ct. App. 2005), *trans. denied*. However, for an abandonment to be considered voluntary, it must in no way be attributable to the influence of extrinsic circumstances. *Barnes v. State*, 269 Ind. 76, 82, 378 N.E.2d 839, 843 (1978). "In short, the attempt to commit a crime must be freely and voluntarily abandoned before the crime is completed and under such circumstances as would show that there were no outside causes prompting the abandonment." *Id.*

[26] Boyer agrees that the instruction is a correct statement of the law that is not covered by other instructions. Instead, he argues that the instruction is not supported by the evidence, noting that he did not advance that theory at trial.

Assuming without deciding that the trial court erred by giving the instruction on the basis that it was not supported by the evidence, instructional error is harmless where a conviction is clearly sustained by the evidence and the instruction would not likely have impacted the jury's verdict. *Townsend v. State*, 934 N.E.2d 118, 127-28 (Ind. Ct. App. 2010). Such is the case here.

[27] The jury had before it evidence that Boyer and Brooks communicated about the December 1, 2014 transaction by telephone and text messages. Armstrong was able to identify Brooks' and Boyer's voices on the audio transmission. Brooks confirmed that the half gram of methamphetamine cost sixty dollars. Boyer told Brooks that this transaction would have to be conducted a little differently because Boyer suspected Brooks was working as a confidential informant for the police. Boyer took the buy money from Brooks and devised a plan for the exchange of the drugs to be made by use of a cigarette carton, the location of which Boyer would communicate to Brooks. Instead, at Boyer's suggestion, the two met at the laundromat where Boyer subsequently was taken into custody. Text messages exchanged between Boyer and a person identified as J.R. revealed that J.R. was watching a car with tinted windows near the location of the buy. This is sufficient evidence to establish that Boyer attempted to deal in methamphetamine. Assuming, *arguendo*, that there was instructional error, such error does not require reversal.

# Conclusion

[28] In light of the foregoing, we affirm Boyer's convictions.

Affirmed.

Riley, J., and Crone, J., concur.