## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 15 2019, 9:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rory Gallagher
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kelly A. Loy
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jonathan Young,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | February 15, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1480<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Lisa F. Borges, Judge<br><br>Trial Court Cause No.<br>49G04-1611-F5-45927 |

**Altice, Judge.**

## Case Summary

[1] Jonathan Young appeals his conviction for Level 5 felony criminal confinement and Level 6 felony domestic battery. He presents two issues for our review: 1) whether his retrial following a mistrial was barred by double jeopardy and 2) whether his sentence is inappropriate.

[2] We affirm.

## Facts & Procedural History

[3] Young and Andrea Hubbard began living together in 2013. They have two daughters – Ev. Y., born March 20, 2014, and El. Y., born October 31, 2016. The family lived together in Young's home in Marion County.

[4] On the evening of November 28, 2016, Young came home and began arguing with Hubbard as she was cooking dinner. Ev. Y. was sitting in a highchair in the kitchen, and El. Y., a newborn, was on a couch in the living room. Young was very upset and angry. Eventually, the argument turned physical when Young ripped off Hubbard's jewelry and her clothing and began punching her repeatedly in the face and head. Ev. Y. was screaming and crying in her highchair during the attack.

[5] Young grabbed Hubbard by the hair and forced her into the basement. As he directed her down the steps, he said, "You're never coming out of this basement. You're never going to breastfeed again." *Transcript Vol. II* at 81. Young then took Hubbard into a dark room in the basement and closed the door. He threw punches in the dark, striking Hubbard a couple times as she

crouched down on the ground. Young moved Hubbard to a bed in the room and sat on her back. After forcing her mouth open and removing her prosthetic tooth, Young whipped Hubbard with an extension cord on her bare back about five times, leaving stinging and painful wounds. He used the cord to hogtie her before he headed back upstairs and left her in the dark.

[6] Once alone, Hubbard was able to loosen the cord and free herself. She searched the basement for something to use for protection but was unable to find anything. She then quietly climbed the stairs and opened the basement door. Hubbard ran and grabbed a knife out of the kitchen as Young came after her again. She inched closer to the back door while struggling with Young. Somehow, she managed to open the back door and escape. Young followed her, as did Ev. Y. Hubbard, still naked, picked up Ev. Y. and ran to a neighbor's house, where she called 911.

[7] Hubbard suffered injuries over her entire body, including to her head, face, arms, legs, back, wrists, and ankles. Photographs depicted bruises, welts, abrasions, a bloodied lip, and whip/ligature marks. Emergency responders offered to take Hubbard to the hospital, but she declined. Police arrested Young at the scene.

[8] On November 30, 2016, the State charged Young with four counts of criminal confinement, two counts of battery, and four counts of domestic battery. The charges were amended on November 28, 1017, with half of the charges dismissed on the State's motion. The following charges remained: Count I,

Level 5 felony criminal confinement; Count III, Level 6 felony domestic battery; Count IV, Level 6 felony criminal confinement; Count VI, Level 6 felony domestic battery; and Count X, Level 6 felony criminal confinement.

[9] Within days of his arrest, Young was released on bond. He was initially represented by private counsel but decided to proceed pro se beginning in March 2017. Thereafter, Young failed to appear for a hearing on July 10, 2017, and the trial court issued a warrant for his arrest. The warrant was served on October 12, 2017, and Young has been incarcerated since that time. New private counsel filed an appearance on Young's behalf following the arrest.

[10] Young's first jury trial commenced on May 7, 2018. After the jury was sworn and during the first witness's testimony, the trial court declared a mistrial due to improper questioning by defense counsel on cross-examination.

[11] Thereafter, on May 10, 2018, Young's second jury trial was held, and the jury found him guilty as charged. At sentencing on July 1, 2018, the trial court entered convictions only on Counts I (criminal confinement resulting in bodily injury) and VI (domestic battery in the presence of a child less than sixteen years of age) and vacated the remaining counts. The trial court imposed concurrent prison sentences of six years with one year suspended to probation on Count I and one year on Count VI. Young now appeals. Additional information will be provided below as needed.

### Discussion & Decision

## 1. Mistrial

The trial court declared a mistrial near the beginning of the evidence in Young's first trial. This occurred after defense counsel cross-examined Hubbard as follows:

> Q. And the second argument, the one I'm referring to after he came back, that was – that was about some accusations of infidelity, correct?
>
> A. What?
>
> Q. About you having an affair possibly?
>
> A. No.
>
> Q. Okay. Was it about some stolen pills?
>
> A. Yes.
>
> Q. Okay. And you were arguing about some stolen Vicodin, in particular, correct?
>
> A. Yes.

*Transcript Vol. II* at 50. The State objected to this line of questioning, and the trial court held a hearing outside the presence of the jury. During a lengthy colloquy with counsel, the trial court stated in regard to the accusations of infidelity and drug theft, "we don't baldly assassinate character without something to back it up, right?" *Id*. at 53. Defense counsel argued that the

accusations were based on discussions with Young, who was not planning to testify, and that the evidence was admissible to impeach Hubbard's credibility. The trial court ultimately determined that the accusations were inadmissible and violated a motion in limine.[1]  Accordingly, the trial court stated:

> Something has to be said because this is not – I can't leave it like this.  So there has to be some agreed upon remedy if we're going to go forward.  Otherwise, I'm just going to mistry the case.  I'm going to think about it for a minute.  I'll be back.

*Transcript Vol. II* at 55.  After a brief break, the trial court returned and stated on the record, still outside the presence of the jury:

> I've conferred with the attorneys and it's my opinion that the damage done by the question asked that was in violation of the Motion in Limine puts the State in a position of peril.  And in a position of peril that's unfair.
>
> Because I had said that if anyone was going to ask any questions about this alleged drug use or alleged theft of a Vicodin pill, drug use at all, anything like that, that there had to be a hearing outside the presence of the jury before anybody asked that question.  Because I don't think there's any way I can wipe that out of the mind of the jury.  And we could just go on, but they're still going to have that sitting there thinking, well, was she unfaithful?  Did she use drugs?  Did she steal?  And those things

---

[1] Earlier that day, the trial court had granted a motion in limine filed by the State.  It provided, in part, that the defense not "mention, refer to, interrogate concerning, *or attempt to convey to the jury in any manner, either directly or indirectly*," without first obtaining permission of the court, "[a]ny questions, testimony, or evidence of any drug use by the victim".  *Appellant's Appendix Vol. III* at 16 (emphasis supplied).

> aren't admissible and don't matter for whether or not this took place.
>
> And so it isn't fair to ask this jury to try to get it out of their head. There's some things people just can't do. And I don't think it's fair to go forward with jurors that have a question mark in their mind that I can't erase.

*Id*. at 55-56. Accordingly, the trial court declared a mistrial, discharged the jury, and scheduled a new trial date for three days later.

[13] On appeal, Young argues that the trial court erred in declaring a mistrial because the evidence was admissible and did not violate the motion in limine. He also asserts that no manifest necessity existed and that the trial court failed to consider "alternative steps short of declaring a mistrial to cure any potential prejudice." *Appellant's Brief* at 13. Because the mistrial was improperly granted, Young contends that his second trial violated double jeopardy.

[14] The Fifth Amendment to the United States Constitution prohibits the State from placing a defendant in jeopardy twice for the same offense. *Jackson v. State*, 925 N.E.2d 369, 372 (Ind. 2010). Jeopardy attaches when a jury has been selected and sworn. *Id*. at 373. The protection against double jeopardy does not bar a retrial, however, if the defendant consents to the mistrial or if there was a "manifest necessity" for the mistrial. *See Brock v. State*, 955 N.E.2d 195, 200 (Ind. 2011), *cert. denied*; *see also Jackson*, 925 N.E.2d at 373 ("Once jeopardy has attached, the trial court may not grant a mistrial over a defendant's objection unless it finds a 'manifest necessity' for the mistrial."). If the

defendant consents to the mistrial, "then retrial is permitted as a matter of course, unless the defendant can prove that the government intentionally goaded him or her into consenting to the mistrial…." *Brock*, 955 N.E.2d at 200.

Thus, determining whether the State was permitted to retry Young after his first trial ended in a mistrial involves a multi-step analysis. *See id*. "We first consider whether he consented to the trial judge's declaration of a mistrial…. If he did not consent to the mistrial, then we consider whether it was justified by a 'manifest necessity.'" *Id*.

A defendant may consent to a mistrial in several ways. Typically, consent involves the defendant successfully requesting "termination of the proceedings on grounds unrelated to guilt or innocence" or "expressly agreeing to be tried again." *Id*. A defendant, though, may impliedly consent to be retried by failing to "raise a timely objection when the government moves for a mistrial or when the trial court declares a mistrial *sua sponte*." *Id*. at 202-03. Our Supreme Court has explained:

> This allows the defendant to control the decision whether to go to the first jury or to forego that option and have a different jury decide his or her fate. As a corollary, trial courts should allow time for such an objection prior to discharging the jury. This will give the trial court an opportunity to rethink its position and correct any error before discharging the jury, thereby avoiding a scenario in which the judge grants a mistrial but later realizes that there was no manifest necessity and precludes the State from achieving its interests in prosecuting offenders in fair trials. Requiring the defendant to make a choice also avoids transforming the protection against double jeopardy into an

abusive weapon used by a defendant to avoid prosecution, particularly when, as here, the mistrial is precipitated by defense counsel's conduct.

*Id*. at 203 (citations omitted).

[17]     In this case, the trial court gave Young ample opportunity to raise a timely objection to a mistrial prior to the jury's discharge.  Defense counsel argued that the questions regarding infidelity and stolen drugs were admissible, but the trial court found otherwise.  After determining that defense counsel's cross-examination of Hubbard violated the motion in limine and was improper, the trial court stated:

> Something has to be said because this is not – I can't leave it like this.  So there has to be some agreed upon remedy if we're going to go forward.  Otherwise, I'm just going to mistry the case.  I'm going to think about it for a minute.  I'll be back.

*Transcript Vol. II at 55*.  At this point, Young did not object on the record to a possible mistrial or propose alternative means to address the matter short of a mistrial.  The trial court took a brief recess and then returned on the record without the jury present.  The court indicated that it had conferred with the attorneys and had come to the conclusion that the improper questions placed the State in a position of unfair peril.  The trial court then informed the parties that it was going to call a mistrial.  Young did not object.  Nor did Young object when the court proceeded to set the retrial for later that week.  The trial court then called the jury into the courtroom and excused the jury.

[18]     As set forth above, we first consider whether the defendant consented to the mistrial. Only when there was no consent (actual or implied) do we then consider "the propriety of defense counsel's comments" and whether any "improper comments constituted a manifest necessity for declaring a mistrial." *Brock*, 955 N.E.2d at 204, 206. We agree with the State that Young consented to the mistrial by failing – despite ample opportunity – to timely object to the trial court's stated intention to call a mistrial.[2] Accordingly, Young waived his double jeopardy claim. *See Jester v. State*, 551 N.E.2d 840, 842 (Ind. 1990) (defendant waived double jeopardy claim "where he made no objection to the court's declaration of the mistrial").

## Sentence

[19]     Young challenges his sentence as inappropriate. Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences. *See Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014), *cert. denied*. Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Per App. R. 7(B), we may revise a sentence "if after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Inman v.*

---

[2] In his reply brief, Young asserts that by arguing at trial that he did not violate the motion in limine or Indiana Rules of Evidence, he not only objected to the trial court's basis for declaring a mistrial but also the mistrial itself. The case he cites to, however, does not support this proposition.

*State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting App. R. 7). "Sentencing review under Appellate Rule 7(B) is very deferential to the trial court." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[20] It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp*, 9 N.E.3d at 1292. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original). Further, on appeal, Young bears the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[21] We initially address Young's multiple assertions that he received the maximum sentence. He did not. Young was convicted of Level 5 felony criminal confinement, which carries a sentencing range of one to six years with an advisory sentence of three years. *See* Ind. Code § 35-50-2-6(b). He was also convicted of Level 6 felony domestic battery, which carries a sentencing range of between six months and two and one-half years with an advisory sentence of one year. *See* I.C. § 35-50-2-7(b). Thus, Young faced a maximum sentence of seven years in prison. *See* I.C. § 35-50-1-2(d)(2) (placing a limit of seven years for consecutive terms of imprisonment arising out of an episode of criminal

conduct where defendant's most serious crime is a Level 5 felony). The trial court imposed an aggregate sentence of six years in prison with one of those years suspended to probation.

[22] With respect to his character, Young asserts that he has a history of stable employment, significant family support, and no history of violence as an adult. Young also implies that he suffers from mental illness, involving paranoia and delusional thinking. We initially observe that Young's claims of mental illness and history of stable employment are not clearly supported by the record. Following a psychiatric evaluation in 2018, the psychiatrist found: "Young did not appear to meet criteria for diagnosis with any serious mental disorder, such as schizophrenia, bipolar disorder or major depression. He also did not meet criteria for diagnosis with any personality disorder." *Appellant's Appendix Vol. III* at 5-6. Additionally, the only evidence regarding Young's past employment was that he worked for a friend's company as a painter for about six months while out on bond in this case. His friend reported that Young was a good employee and had a job waiting for him upon his release.

[23] The record reveals that at thirty-five years of age Young had a significant criminal history. Starting as early as age fourteen, Young had multiple encounters with the juvenile system, including allegations of battery, forgery, disorderly conduct, and multiple counts of theft. His adult criminal history began at the age of eighteen. Young accumulated eight misdemeanor convictions from 2002 through 2014, in six different Indiana counties. Additionally, in 2009, Young was found in violation of probation, resulting in

an extension of his probation by six months. Although his adult convictions are for non-violent crimes (i.e., drug possession, OWI, and driving while suspended), their sheer number and breadth are indicative of his general disregard for the law and poor character.

[24] We find particularly telling of Young's character the fact that he attacked Hubbard in front of their toddler. Instead of being swayed to stop by hearing Ev. Y.'s screaming and crying, he simply moved Hubbard to the basement to continue and escalate the attack. Further, the record shows that Young has no remorse for his actions. In fact, at sentencing, he continued to portray himself as the victim, indicating that he had "been thrown through the ringer" and describing the situation as "water under the bridge." *Transcript Vol. II* at 199. Young stated, "I wish to move on with my life. I obviously have priorities that are set beyond roomiating (sic) on my relationship with Andrea." *Id.*

[25] Turning to the nature of Young's offense, we observe that his drawn-out, violent attack on Hubbard was particularly horrific and went well beyond that necessary to establish the underlying offenses. As noted above, the couple's toddler had a front-row view of the attack as she sat in her highchair crying. Young stripped Hubbard of her jewelry and clothing and proceeded to punch her multiple times about the head and face. Hubbard did not fight back. He then dragged Hubbard by her hair to the basement, where he threatened her and continued the violence by punching her and whipping her multiple times with an electrical cord. He then hogtied Hubbard with the cord and left her in the dark basement. When Hubbard eventually freed herself and crept upstairs,

Young struggled with her to keep her from leaving. Hubbard managed to escape out of the back door and ran naked with Ev. Y. to a neighbor's home for help. Aside from the emotional toll, Hubbard suffered multiple physical injuries. She described at trial the stinging pain she endured from being whipped across her bare back, injuries from which are pictured in the record.

[26] In sum, we conclude that Young's sentence of five years executed in prison and one year on probation is not inappropriate in light of the nature of his offense or his character. Accordingly, the sentence imposed by the trial court was not inappropriate.

[27] Judgment affirmed.

Najam, J. and Pyle, J., concur.