## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 11 2019, 9:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Thomas Lowe
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian A. McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John Robert Carpenter, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | February 11, 2019 <br><br> Court of Appeals Case No. 59A01-1708-CR-1945 <br><br> Appeal from the Orange Circuit Court <br><br> The Honorable R. Michael Cloud, Special Judge <br><br> Trial Court Cause No. 59C01-1406-MR-389 |

**Tavitas, Judge.**

# Case Summary

John Carpenter appeals his convictions and sentence for murder; voluntary manslaughter, a Class A felony; and robbery resulting in serious bodily injury, a Class A felony. We affirm.

# Issues

Carpenter raises five issues, which we restate as:

I.   Whether the trial court properly determined that Carpenter was competent to stand trial.

II.  Whether the trial court properly admitted Carpenter's statement to the police.

III. Whether the trial court properly admitted the surviving victim's in-court identification of Carpenter.

IV.  Whether the trial court properly denied Carpenter's motion for a mistrial.

V.   Whether Carpenter's sentence is inappropriate.

# Facts

On June 23, 2014, Daniel Smitson, Michael Corey Harris, and another unidentified person were visiting with Nicky Fields at Fields' Orange County residence when the door to the mobile home "swung open." Tr. Vol. IX p. 197. A man, later identified as Carpenter, said that "him and [Fields] needed to talk." *Id.* at 198. Fields asked Carpenter to wait outside until everyone left.

[4] Smitson went outside and saw three men—Carpenter, Elbert Brooks, and James Davidson—waiting on the porch. Smitson also saw their red and silver pickup truck. Smitson pretended to work on some equipment, had a conversation with the men, and went back inside. At some point, Harris and the other unidentified visitor left.

[5] Carpenter then knocked on the door, and Smitson answered. Carpenter pointed a gun at Smitson and hit him on the head with the gun, which dazed Smitson. The men entered the home, ordered Smitson and Fields to get face down on the floor, and started searching the residence. The men took money, drugs, and weapons. Brooks shot both Fields and Smitson in the head. As Carpenter, Davidson, and Brooks were leaving, Harris was returning to Fields' residence, and the men saw him in the driveway. Carpenter then shot Harris.

[6] Fields and Harris died from gunshot wounds to the head, and Smitson survived. When Smitson ran out of the house, he found Harris near the road on the ground and saw people trying to help Harris. On the same day, while Smitson was in the hospital, Indiana State Police Detective David Henderson and Indiana State Police Trooper Jonathan Lamb interviewed Smitson. In that interview, Smitson described the red and silver Dodge truck driven by the suspects. Smitson reported the attack by three white men, and he described the man who shot him.

[7] Indiana State Police Detective Shane Staggs was assigned to investigate the incident. Detective Staggs quickly focused on Carpenter as a suspect and

discovered that Carpenter drove a red and silver pickup truck. Detective Henderson received a picture of Carpenter and showed the single picture to Smitson. Smitson identified Carpenter as being one of the men involved in the incident.

[8] On June 25, 2014, a report was made regarding the location of one of the men involved in the shootings. Officers arrived at the reported residence and found Brooks. Davidson was arrested a couple of days later, and Carpenter's truck was located in an old barn in Harrison County.

[9] On June 29, 2014, officers located Carpenter in another old barn in Harrison County where he was sleeping on a bale of hay. Detective Staggs provided Carpenter with food and water and took Carpenter to the jail to interview him. Before Carpenter was interviewed, he asked Detective Staggs if he could see his wife and child. Detective Staggs told Carpenter that he needed to speak to him first. Detective Staggs read the *Miranda* rights to Carpenter, and Carpenter indicated that he understood his rights. Carpenter then gave a detailed account of the events at Fields' residence.

[10] Carpenter admitted that he, Brooks, and Davidson planned to rob Fields and that the robbery was his idea. During the robbery, Carpenter took Fields' handgun and gave it to Brooks. After Carpenter and Davidson walked out of Fields' residence, Brooks shot both Fields and Smitson. When Carpenter and Davidson walked outside, they saw Harris, who said: "What's going on." Ex. Vol. I p. 61. Carpenter saw Harris reaching into his pocket, and Carpenter shot

Harris. Carpenter told Detective Staggs that his proceeds from the robbery were in an abandoned cistern on Milltown-Frenchtown Road. After the interview, Detective Staggs told Carpenter that he would take Carpenter to see his child.

[11] A handgun, along with several other guns and knives, were found in the cistern described by Carpenter. An analysis showed that the handgun found in the cistern fired two cartridge cases that were found in Fields' residence. The handgun used to shoot Harris was never located. Carpenter claimed that he disposed of that gun in pieces.

[12] Subsequently, the State charged Carpenter with Count I, murder related to Harris; Count II, murder related to Fields; and Count III, robbery resulting in serious bodily injury, a Class A felony, related to the injuries sustained by Smitson. The State also alleged that Carpenter was a habitual offender.

[13] Carpenter filed a motion to determine his competency to stand trial, and the trial court appointed Dr. Michael Coots and Dr. Frederick Nolen to examine Carpenter. Dr. Coots determined that Carpenter was competent to stand trial. Dr. Nolen concluded that Carpenter was not competent to stand trial based on a traumatic brain injury from a 2012 car accident and earlier head injuries. After a hearing, the trial court found Carpenter competent to stand trial.

[14] Carpenter filed two motions to suppress his statement to Detective Staggs. In the first motion, Carpenter argued that he did not knowingly and voluntarily waive his *Miranda* rights. In the second motion, Carpenter argued that his

statement was not voluntary. Carpenter argued that Detective Staggs' promise to let Carpenter see his wife and child, Carpenter's traumatic brain injury, and Carpenter's lack of sleep and drug use made his statement involuntary. The trial court denied Carpenter's motions to suppress the statement to Detective Staggs.

[15] Carpenter also filed a motion to suppress Smitson's identification of Carpenter. After a hearing, the trial court ordered the following:

> ISP Troopers Henderson and Lamb, and possibly others, displaying a single photograph of John Robert Carpenter to Steven Daniel Smitson at the University of Louisville Hospital on June 23, 2014, and Steven Daniel Smitson identifying the man depicted in the photograph as John Robert Carpenter, and that Carpenter was one of the men who came to the Nicky Fields home at 2350 North County Road 200 West, Paoli, Indiana on June 23, 2014, and that Carpenter was there when Smitson was shot are suppressed, and evidence and argument of this identification based upon the display of the single photograph shall not be admissible at trial herein. It is further ORDERED that the single photograph in question is suppressed as well, and shall not be admissible at trial herein.
>
> It is further ORDERED that the Defendant's request to suppress in Court identification of John Robert Carpenter by Steven Daniel Smitson is denied, and admission of the same at trial will depend upon the necessary evidentiary foundation presented by the State at trial.

Appellant's App. Vol. VII p. 96.

[16] Carpenter also filed a motion in limine regarding the jury seeing Carpenter in visible restraints. The trial court granted the motion and ordered that "the Prosecuting Attorney, his staff, and all law enforcement officers and personnel in charge of security at the trial of this cause, shall ensure that the Defendant is free from all visible handcuffs, leg shackles, and other restraints while in the presence of the jury and/or potential jurors." *Id.* at 69.

[17] During the jury trial, Carpenter objected to the admission of his interview with Detective Staggs for the same reasons as his earlier motions to suppress. The trial court overruled the objection. Carpenter also objected to Smitson's in-court identification of him. The trial court overruled the objection, and Smitson testified that Carpenter was one of the three men at Fields' residence.

[18] Near the end of the jury trial, Carpenter moved for a mistrial because each morning Carpenter's leg shackles, handcuffs, and belt were placed on a window sill outside of the courtroom above a staircase used by the jury. According to Carpenter, the shackles, handcuffs, and belt were visible to the jury as they entered and left the courtroom each day. Carpenter argued that the State violated the trial court's order and, accordingly, that he was entitled to a mistrial. After hearing evidence on the issue, the trial court denied the motion for a mistrial. The trial court noted that no evidence was presented that any juror or alternate juror had seen Carpenter in any restraints.

[19] The jury found Carpenter guilty of: Count I, voluntary manslaughter, a Class A felony, as a lesser included offense of murder; Count II, murder; and Count III,

robbery, a Class A felony.  The jury also found Carpenter to be a habitual offender.

[20] The trial court sentenced Carpenter to consecutive sentences of fifty years for the voluntary manslaughter conviction; sixty-five years for the murder conviction; and fifty years for the robbery conviction.  The trial court enhanced the sentence by thirty years for Carpenter's status as a habitual offender, for an aggregate sentence of 195 years in the Department of Correction.

## Analysis

### I. Competency

[21] Carpenter argues that the trial court erred by finding him competent to stand trial.  A trial court's determination of competency to stand trial is reviewed under the clearly erroneous standard.  *Edwards v. State*, 902 N.E.2d 821, 824 (Ind. 2009).  We will reverse on appeal only if the decision is unsupported by the facts and circumstances before the trial court together with any reasonable inferences to be drawn therefrom.  *Id.*

[22] "'To be competent at trial, a defendant must be able to understand the nature of the proceedings and be able to assist in the preparation of his defense.'" *McManus v. State*, 814 N.E.2d 253, 260 (Ind. 2004) (quoting *Timberlake v. State*, 753 N.E.2d 591, 598 (Ind. 2001), *cert. denied*, 537 U.S. 839, 123 S. Ct. 162 (2002)), *cert. denied*, 546 U.S. 831, 126 S. Ct. 53 (2005).  "We have defined this standard as 'whether or not the defendant currently possesses the ability to consult rationally with counsel and factually comprehend the proceedings

against him or her.'" *Id.* (quoting *Brewer v. State*, 646 N.E.2d 1382, 1384 (Ind. 1995)). "'The trial and conviction of one without adequate competence is a denial of federal due process and a denial of a state statutory right as well.'" *Id.* (quoting *Brewer*, 646 N.E.2d at 1384).

[23] Carpenter argues that the trial court's competency decision was erroneous because the trial court relied on Dr. Coots' finding of competency rather than Dr. Nolen's finding of incompetency.[1] Pursuant to Indiana Code Section 35-36-3-1, the trial court appointed Dr. Coots and Dr. Nolen to examine Carpenter.

[24] At a competency hearing, Dr. Coots testified that he administered a competency to stand trial assessment, a WRAT-3 test, and a mental status exam. Based on those tests and the clinical interview, Dr. Coots found:

> Results of the present evaluation show a 37 year old man with a lengthy history of prior legal problems and incarceration. He has a history of mental illness as indicated by his report but was unwilling to divulge specific details about prior treatment but did state he had been hospitalized in the past and had received most treatment "in prison". His presentation at this time was that of [a] calm, focused, deliberate individual that was responsive but

---

[1] Carpenter also takes issue with the trial court's failure to make "specific findings as to the reasons it discounted the testimony of Dr. Nolen, other than to say the court considered the reports and testimony of both Drs. [sic]." Appellant's Br. p. 15. We note that Carpenter cites no authority that the trial court was required to issue specific findings of fact and conclusions of law regarding Carpenter's competency to stand trial. Indiana Appellate Rule 46(A)(8)(a) requires an appellant to support contentions with citations to authorities and cogent argument, which Carpenter failed to do. This argument is waived. *See, e.g., Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015) ("A litigant who fails to support his arguments with appropriate citations to legal authority and record evidence waives those arguments for our review.").

guarded. He was logical and sequential with no signs of thought disorder or psychosis. His mood was perhaps somewhat blunted and restricted and affect congruent but not to a degree to have discernable impact on reasoning. He gives impression of someone with average or better cognitive ability and results of the WRAT-3 support this with scores in the average to very high range. He understands the seriousness and scope of the charges against him and the possible outcome. He understandings [sic] the roles of those in the courtroom and the proceedings. He expressed trust in his attorney and by all findings of the present assessment has the intellect and abilities to cooperate in his defense. He is not self defeating in his actions regarding his case.

Ex. Vol. I p. 29.

[25] Dr. Nolen, on the other hand, found Carpenter incompetent to stand trial. Dr. Nolen concluded that Carpenter had a severe traumatic brain injury from a 2012 car accident and other incidents prior to the car accident. Based on tests that Dr. Nolen performed, he concluded:

The psychological and neurocognitive tests I performed on [Carpenter] indicates [sic] he is still seriously cognitively impaired and cannot participate in his defense. He may know the meanings of most of the words but his problem with processing complex information will probably leave him dazed and confused about what is going on and what it means for him. He will also probably not be able to remember the normal amount of the proceedings after they are done each day.

*Id.* at 14.

[26] The State points out that Dr. Nolen did not use "the most common tool for evaluating competence, but instead relied significantly on his own 'trauma

inventory' which he had invented and which had not been peer-reviewed."
Appellee's Br. p. 35. Carpenter's argument is merely a request that we reweigh
the evidence, which we cannot do. The trial court weighed the opinions of Dr.
Coots and Dr. Nolen and found Dr. Coots' opinion more persuasive. We
cannot say that this decision was clearly erroneous.

## II. Carpenter's Statement to Police

Next, Carpenter argues that the trial court abused its discretion by admitting his
statement to Detective Staggs. Although Carpenter frames the issue as whether
the trial court erred by denying his motion to suppress, because he appeals
following a jury trial, the issue is more properly framed as whether the trial
court abused its discretion by admitting the statement. *See Clark v. State*, 994
N.E.2d 252, 259 (Ind. 2013). The general admission of evidence at trial is a
matter we leave to the discretion of the trial court. *Id.* at 259-60. We review
these determinations for abuse of that discretion and reverse only when
admission is clearly against the logic and effect of the facts and circumstances
and the error affects a party's substantial rights. *Id.* at 260.

Carpenter first argues that his statement was not admissible because he did not
voluntarily waive his *Miranda* rights before giving his statement to Detective
Staggs.[2] The Fifth Amendment grants to individuals, among other rights, the

---

[2] Although Carpenter briefly mentions the Indiana Constitution in connection with this argument, he does
not develop a separate argument. Consequently, he has waived the issue. *See Jackson v. State*, 925 N.E.2d
369, 372 n.1 (Ind. 2010) (holding that the defendant's state constitutional claim was waived for failure to
make a separate argument).

right to be free from self-incrimination. U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."). This provision applies to the states by virtue of the Fourteenth Amendment. *Hartman v. State*, 988 N.E.2d 785, 787 (Ind. 2013) (citing *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492 (1964)). "In *Miranda v. Arizona*, the United States Supreme Court outlined an additional prophylactic requirement, inherent in the privilege against self-incrimination, that an individual must be informed of his right to have counsel present during custodial interrogation." *Id.* (citing *Miranda v. Arizona*, 384 U.S. 436, 469, 86 S. Ct. 1602, 1625 (1966)).

[29] "A waiver of one's *Miranda* rights occurs when the defendant, after being advised of those rights and acknowledging that he understands them, proceeds to make a statement without taking advantage of those rights." *Ringo v. State*, 736 N.E.2d 1209, 1211-12 (Ind. 2000). The admissibility of a confession is controlled by determining from the totality of the circumstances whether the confession was made voluntarily and was not induced by violence, threats, or other improper influences that overcame the defendant's free will. *Id.* The same test determines whether *Miranda* rights were voluntarily waived. *Id.* Thus, the voluntariness of a defendant's waiver of rights is judged by the totality of the circumstances. *Id.* A signed waiver form is one item of evidence showing the accused was aware of and understood his rights. *Id.* When challenged, the State may need to show additional evidence tending to prove that a defendant's waiver and decision to speak were voluntary. *Id.*

[30] Carpenter argues that the waiver of his *Miranda* rights was not voluntary because he was "still suffering from the permanent effects" of a traumatic brain injury and he had been without sleep for five days due to methamphetamine use. Appellant's Br. p. 17. Carpenter claimed during his hearing on the motion to suppress that, prior to giving the statement, he had not slept in five or six days due to methamphetamine use. He also relies on Dr. Nolen's evaluation to support his contention.

[31] The evidence demonstrates that Carpenter was fully advised of his rights and voluntarily waived those rights. The trial court had already found Dr. Nolen's evaluation to be unpersuasive. Moreover, evidence was presented that Carpenter was asleep when he was located in the barn. The trial court was not required to give credit to Carpenter's claims that he was sleep-deprived from drug use. Under the totality of the circumstances, the trial court was well within its discretion to conclude that Carpenter's waiver of his *Miranda* rights was voluntary. *See, e.g., Ringo*, 736 N.E.2d at 1212 (holding that the defendant voluntarily waived his *Miranda* rights).

[32] Carpenter next argues that his statement was involuntary because of Detective Staggs' promise to let Carpenter see his wife and child. Carpenter contends that Detective Staggs' promise "negated the voluntariness of his statement." Appellant's Br. p. 18. "Coercive police activity is a necessary prerequisite to finding a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." *Ringo*, 736 N.E.2d at 1212. "A confession is voluntary if, in light of the totality of the circumstances, the

confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Id.* "The critical inquiry is whether the defendant's statements were induced by violence, threats, promises or other improper influence." *Id.* at 1212-13.

[33] Carpenter admitted at the hearing on the motion to suppress that Detective Staggs did not raise the possibility of Carpenter seeing his wife and child; rather, it was Carpenter's idea. Moreover, Detective Staggs did not say Carpenter could not see his wife and child if he did not give a statement. The evidence demonstrates that Detective Staggs merely wanted to speak with Carpenter first, before he saw his wife and child. At the start of the recorded interview, the following discussion occurred:

> C:  Well what happens if my wife can't make it here for like an hour or something . . . .
>
> S:  Then I'll . . . .
>
> C:  . . . . or two hours?  I mean that's gonna . . . .
>
> S:  I'll . . . .
>
> C:  . . . . I mean that's gonna screw me out of mine cause . . . .
>
> S:  No, I'll sit here and wait with you two hours if I have to.
>
> C:  Okay.

S:  Sound like a deal?

C:  It works for me just fine.

S:  Alright.  I told you I'd let you see them so, that's what I'm gonna do.  Alright.  John, I'm sure you know what I've got to read to you.  Okay?

C:  My rights or whatever?

S:  Yeah, I've got to read you your rights.  Alright?  It's just something I got to do.  Um, before we ask you any questions, you must understand your rights.

Ex. Vol. I p. 51.

[34]  Carpenter could have refused to speak with Detective Staggs.  Detective Staggs testified that he still would have let Carpenter see his wife and child.  Detective Staggs testified,

> [Carpenter] wanted to see his little girl and his wife and I told him that I needed to speak to him first and at that point he said, you know, he made it clear that he wanted to give a statement, but, he wanted to see his wife and child, so, I . . . made those arrangements.

Tr. Vol. X pp. 85-86.  Detective Staggs further testified, "I called his wife and child before, um, I mean he could of [sic] told me to (inaudible) and not talk to me and I would still let him see his wife and child- . . . ."  *Id.* at 86.

Detective Staggs' promise to Carpenter was not coercive or conditioned on Carpenter giving a statement. Under these circumstances, Carpenter's statement was not induced by violence, threats, promises or other improper influence. The trial court did not abuse its discretion by admitting Carpenter's statement to Detective Staggs. *See, e.g., Ringo*, 736 N.E.2d at 1213 (holding that the defendant's confession was admissible despite his claim that it was involuntary due to lack of sleep and intoxication).

### III. Smitson's In-Court Identification

Next, Carpenter argues that the trial court abused its discretion by admitting Smitson's in-court identification of Carpenter.[3] The general admission of evidence at trial is a matter we leave to the discretion of the trial court. *Clark,* 994 N.E.2d at 259-60. We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.* at 260.

The Due Process Clause of the Fourteenth Amendment requires suppression of testimony concerning a pre-trial identification when the procedure employed is impermissibly suggestive. *Swigeart v. State*, 749 N.E.2d 540, 544 (Ind. 2001). "A pre-trial identification may occur in a manner so suggestive and conducive

---

[3] Although Carpenter briefly mentions the Indiana Constitution in connection with this argument, he does not develop a separate argument. Consequently, he has waived the issue. *See Jackson*, 925 N.E.2d at 372 n.1 (holding that the defendant's state constitutional claim was waived for failure to make a separate argument).

to mistaken identification that permitting a witness to identify a defendant at trial would violate the Due Process Clause." *Id.* "Nevertheless, a witness who participates in an improper pretrial identification procedure may still identify a defendant in court if the totality of the circumstances shows clearly and convincingly that the witness has an independent basis for the in-court identification." *Id.*

[38] To determine whether a witness had an independent basis for the in-court identification, we consider the following factors:

> The amount of time the witness was in the presence of the defendant; the distance between the two; the lighting conditions; the witness' degree of attention to the defendant; the witness' capacity for observation; the witness' opportunity to perceive particular characteristics of the perpetrator; the accuracy of any prior description of the perpetrator by the witness; the witness' level of certainty at the pretrial identification; and the length of time between the crime and the identification.

*Id.*

[39] On the day of the incident, while Smitson was in the hospital, Detective Henderson and Trooper Lamb interviewed Smitson. In that interview, Smitson described a red and silver Dodge truck driven by the suspects. Smitson said they were attacked by three white men, and he described the man that shot him as wearing a bandana and having a "goatee, kind of bald, about five foot eight probably." Ex. Vol. V p. 115. Later, Detective Henderson learned that Carpenter had been developed as a suspect, and Detective Henderson received

a picture of Carpenter. Detective Henderson showed the single picture to Smitson, and Smitson identified the man in the picture as being one of the men involved. The next day, Detective Staggs interviewed Smitson. Smitson said that one of the men "had a bandana, bald head, goatee, um, kind of stocky." *Id.* at 127. Smitson also stated that the other men kept calling the man, "John," and asking, "John, what do you want us to do with this . . . ." *Id.*

[40] Carpenter filed a motion to suppress Smitson's identification of Carpenter. After a hearing, the trial court partially granted the motion to suppress and ordered that Smitson's "identification based upon the display of the single photograph shall not be admissible at trial herein." Appellant's App. Vol. VII p. 96. With respect to any in-court identification, the trial court denied the motion to suppress and ordered that the "admission of the same at trial will depend upon the necessary evidentiary foundation presented by the State at trial." *Id.* At trial, Smitson identified Carpenter as one of the assailants over Carpenter's objection.

[41] The trial court did not admit Smitson's identification of Carpenter when he was shown Carpenter's picture in the hospital. Carpenter argues that the hospital identification was so suggestive that Smitson's in-court identification of Carpenter should have been inadmissible. Smitson, however, had an independent basis for his in-court identification of Carpenter.

[42] Smitson testified that he was visiting with Fields when the door to the mobile home "swung open." Tr. Vol. IX p. 197. The man, later identified as

Carpenter, said that "him and [Fields] needed to talk." *Id.* at 198. Fields asked Carpenter to wait outside until everyone left. Smitson went outside, saw the three men waiting, and saw their red and gray pickup truck. Smitson was curious about the men and went outside where he pretended to work on a piece of equipment. Smitson had a conversation with the men and went back inside. Carpenter then knocked on the door, and Smitson answered. Carpenter pointed a gun at Smitson and hit him on the head with the gun, which dazed Smitson. The men ordered Smitson and Fields to get face down on the floor, and they started searching the residence. After taking money, drugs, and weapons, Brooks shot both Fields and Smitson in the head.

[43] Smitson was in Carpenter's presence for several minutes before and during the robbery. Smitson observed Carpenter and the other men from both a close distance and from further away. Smitson also observed the men both outside and inside the trailer. Smitson was able to accurately describe the men's vehicle, which matched the description of Carpenter's truck. Smitson also noted that one of the men was wearing a bandana, and a bandana was later found in Carpenter's truck.

[44] We conclude that the totality of the circumstances shows Smitson had an independent basis for his in-court identification of Carpenter. *See, e.g., Swigeart*, 749 N.E.2d at 545 (holding that the officer had an independent basis for his in-court identification of the defendant). The trial court did not abuse its discretion by admitting Smitson's in-court identification of Carpenter.

## *IV. Motion for a Mistrial*

Carpenter also argues that the trial court abused its discretion by denying his motion for a mistrial after jurors saw shackles, handcuffs, and restraints on a window sill outside of the courtroom. The denial of a mistrial lies within the sound discretion of the trial court and is reviewed solely for abuse of that discretion. *Isom v. State*, 31 N.E.3d 469, 480 (Ind. 2015), *cert. denied*, 136 S. Ct. 1161 (2016). "[A] mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Id.* at 481.

"The general rule precludes presenting a defendant to the jury in handcuffs or shackles, but a court may need to do so in certain exceptional circumstances when restraint is necessary to prevent the escape of the prisoner, to protect those in the courtroom, or to maintain order." *Davis v. State*, 770 N.E.2d 319, 325 (Ind. 2002). "[I]t is not an abuse of discretion for a trial court to deny a motion for mistrial because a juror has seen a defendant in handcuffs unless the defendant demonstrates actual harm." *Id.*

Carpenter cannot show an abuse of discretion here. There is no indication that the jurors actually saw Carpenter in the shackles, handcuffs, or restraints. Rather, the shackles, handcuffs, and restraints were merely left on a window sill outside of the courtroom, and the jurors walked past the area to enter and leave the courtroom. In *Warr v. State*, 877 N.E.2d 817, 822 (Ind. Ct. App. 2007), *trans. denied*, we found no reversible error where the jurors did not indicate "that they actually saw Warr in handcuffs or other restraints." Similarly, here, the extreme remedy of a mistrial was not warranted by the jurors merely seeing the

restraints sitting in the courthouse. The trial court did not abuse its discretion by denying the motion for a mistrial.

## V. Sentence

[48] Next, Carpenter argues that his sentence is inappropriate. Indiana Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." *McCain v. State,* 88 N.E.3d 1066, 1067 (Ind. 2018). The defendant bears the burden to persuade this court that his or her sentence is inappropriate. *Phipps v. State,* 90 N.E.3d 1190, 1198 (Ind. 2018). Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Shoun v. State,* 67 N.E.3d 635, 642 (Ind. 2017). Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Cardwell,* 895 N.E.2d at 1224.

[49] In determining whether a sentence is inappropriate, we look to the statutory ranges established for the classification of the relevant offense. Carpenter was convicted of murder; voluntary manslaughter, a Class A felony; and robbery resulting in serious bodily injury, a Class A felony. The sentencing range for murder is forty-five years to sixty-five years with an advisory sentence of fifty-

five years. *See* Ind. Code § 35-50-2-3. The sentencing range for a Class A felony was twenty to fifty years with an advisory sentence of thirty years. *See* Ind. Code § 35-50-2-4. The habitual offender statute in effect at the time of Carpenter's offenses provided: "The court shall sentence a person found to be a habitual offender to an additional fixed term that is not less than the advisory sentence for the underlying offense nor more than three (3) times the advisory sentence for the underlying offense. However, the additional sentence may not exceed thirty (30) years." Ind. Code § 35-50-2-8. Carpenter received the maximum sentence of 195 years.

[50] The trial court found several aggravators, including: (1) Carpenter's criminal history; (2) the harm, injury, loss, or damage suffered by the victims; (3) the nature and circumstances of the offense, especially the execution-style shootings; (4) Carpenter's lack of remorse; (5) the victimization of three separate people; and (6) Carpenter was the ringleader in the incident. The trial court also found one mitigating factor—Carpenter's traumatic brain injury. The trial court rejected Carpenter's other proposed mitigating factors, including: (1) undue hardship to Carpenter's family; (2) Carpenter's cooperation with investigators; and (3) Carpenter's good behavior while incarcerated.

[51] The nature of the offense is that Carpenter was the instigator in deciding to rob Fields. Carpenter recruited Davidson and Brooks, and Carpenter drove the men to Fields' residence. Carpenter had a gun and took Fields' gun, which Brooks used to shoot Fields and Smitson. The men stole weapons, drugs, and money from Fields. As the men were leaving Fields' residence, Harris arrived,

and Carpenter shot Harris in the head. Although Smitson survived being shot in the head, he has been left with lasting, severe damage. After committing these offenses, Carpenter went to a casino to gamble, hid some of the proceeds from the robbery in an abandoned cistern, and hid his truck. Police ultimately found him a few days later in a remote old barn sleeping on bales of hay. Carpenter did confess to the offenses.

[52] As for Carpenter's character, we begin by discussing his criminal history. Carpenter's criminal history includes five prior felony convictions and three misdemeanor convictions. Carpenter first went to adult prison in 1994 at the age of fifteen when he was convicted of burglary, a Class C felony. In 1996, he was convicted of two counts of burglary, as Class B felonies. In 2003, he was convicted of escape, a Class C felony. In 2004, he was convicted of arson, a Class B felony. Additionally, Carpenter has misdemeanor convictions for resisting law enforcement, battery, and possession of paraphernalia.

[53] The trial court acknowledged as a mitigating factor that Carpenter has a traumatic brain injury resulting from a 2012 car accident. The trial court, however, correctly pointed out that "there is conflicting evidence as to the severity or lasting debilitating effects of the injury." Appellant's App. Vol. VIII p. 38. Of significance to us, which the trial court also found significant, is that all of Carpenter's prior felonies were committed before the 2012 injury. Carpenter also has a wife and child, and Carpenter argued that undue harm to them was a mitigating factor. The evidence, however, indicated that Carpenter rarely worked and would disappear for days or weeks at a time.

[54] Carpenter argues that this court should reduce his sentence because Davidson and Brooks received lesser sentences. Davidson pleaded guilty and received a sentence of forty years, and Brooks pleaded guilty and received a sentence of 100 years. Carpenter, however, was the ringleader in this incident and, unlike Davidson and Brooks, did not plead guilty. We do not find that Davidson's and Brooks' lesser sentences require a reduction in Carpenter's sentence. Although Carpenter's sentence is the maximum, given Carpenter's extensive criminal history combined with the brutal nature of this offense, we do not find the sentence inappropriate given the nature of the offense and the character of the offender.

## Conclusion

[55] The trial court did not abuse its discretion by finding Carpenter competent to stand trial. The trial court also did not abuse its discretion by admitting Carpenter's statement to Detective Staggs or Smitson's in-court identification of Carpenter. The trial court properly denied Carpenter's motion for a mistrial, and Carpenter's sentence is not inappropriate. We affirm.

[56] Affirmed.

Brown, J., and Altice, J., concur.